**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES BRAND, MARVIN COOPER, HAROLD GUNN, KEVIN JACKSON, MICHAEL DICKENS, ISAIAH ELDER, DONALD HART, SHANNON JORDAN, SHERMAN PETERSON, CYRUS ROBINSON, and TIM WHARTON | ) ) ) ) ) ) ) ) ) ) | |
| On behalf of themselves and a class of similarly situated African American employees, | ) ) ) | No.  11-cv-8471 |
| Plaintiffs, | ) ) ) | Judge _ _ _ _ |
| v. | ) ) ) | Magistrate Judge _ _ _ _ |
| COMCAST CORPORATION, INC., | ) ) ) | Jury Trial Demanded |
| Defendant. | ) ) | |

**COMPLAINT**

**NATURE OF THE ACTION**

This is an action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 (e) *et seq*.  ("Title VII"), Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981 (a), and the Civil Rights Act of 1866, 42 U.S.C. §1981 to correct unlawful employment practices on the basis of race and to provide appropriate relief to James Brand, Marvin Cooper, Harold Gunn, Kevin Jackson, Michael Dickens, Isaiah Elder, Donald Hart, Shannon Jordan, Sherman Peterson, Cyrus Robinson, Tim Wharton, and a class of similarly situated African American former and current Comcast Corporation, Inc. employees employed at Comcast's facility at 721 E. 112th

Street, Chicago, IL 60628 (hereinafter "Plaintiffs"). Plaintiffs allege that Comcast Corporation, Inc. (hereinafter "Comcast") has engaged in an ongoing pattern of race discrimination against African American employees at its South Chicago Facility, located at 721 112th Street, Chicago, IL 60628 ("South Side" facility). That facility services South Chicago customers located between 43rd Street and 142nd Street and between Harlem Avenue and South Shore Drive.

The South Side facility's employee population is approximately 90% African American. The customers served by the South Side facility are predominantly African American. Due to the race of both the employees and the customers, Comcast discriminated against employees at the South Side facility.

Comcast discriminated against employees at the South Side location by 1) forcing class members to work in substandard facilities which were infested with cockroaches and rats; 2) requiring South Side employees to install infested and/or defective equipment to its customers and denying them other necessary equipment and tools required to provide adequate service to its customers; 3) failing to provide training and to promote South Side African American employees into higher level positions; 4) failing to provide equal pay and fair evaluations to South Side African American employees; and 5) subjecting South Side African American employees to a hostile work environment by: referring to African American employees in a racially derogatory manner, applying workplace rules and regulations in a racially biased manner, falsely assuming that equipment given to African American employees would be stolen, instructing African American employees to follow different protocol from similarly situated non-African American employees when placing service calls, and failing to provide African American employees with facilities that would allow equal levels of service as compared to the facilities of non-African American employees.

In response to these discriminatory practices, South Side African American employees made repeated complaints about their own treatment and the treatment of Comcast's South Side African American customers.  In response, Comcast did nothing to remedy the discrimination. In fact, the Manager of Human Resources was instructed to <u>stop</u> documenting discrimination complaints.

## JURISDICTION AND VENUE

1. This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, § 1337 and § 1343. This action is authorized and instituted pursuant to Section 706 (f) (1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, Section 102 of the Civil Rights Act of 1991 and Section 1981 of the Civil Rights Act of 1866, as amended.

2. Venue is proper in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1391, because the unlawful conduct alleged herein was committed and continues to occur within the boundaries of the Northern District of Illinois.

## INDIVIDUAL PLAINTIFFS

3. Plaintiff James Brand is an adult African American male and resident of Cook County, Illinois.

4. Plaintiff Marvin Cooper is an adult African American male and resident of Cook County, Illinois.

5. Plaintiff Harold Gunn is an adult African American male and resident of Cook County, Illinois.

6. Plaintiff Kevin Jackson is an adult African American male and resident of Cook County, Illinois.

7. Plaintiff Michael Dickens is an adult African American male and resident of Cook County, Illinois.

8. Plaintiff Isaiah Elder is an adult African American male and resident of Cook County, Illinois.

9. Plaintiff Donald Hart is an adult African American male and resident of Cook County, Illinois.

10. Plaintiff Shannon Jordan is an adult African American male and resident of Cook County, Illinois.

11. Plaintiff Sherman Peterson is an adult African American male and resident of Cook County, Illinois.

12. Plaintiff Cyrus Robinson is an adult African American male and resident of Cook County, Illinois.

13. Plaintiff Tim Wharton is an adult African American male and resident of Cook County, Illinois.

14. On September 23, 2008, Plaintiffs James Brand, Marvin Cooper, Michael Dickens, Isaiah Elder, Harold Gunn, Donald Hart, Kevin Jackson, Sherman Peterson, and Cyrus Robinson filed Charges of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") alleging race discrimination against Comcast.

15. On January 2, 2009, Plaintiff Shannon Jordan filed a Charge of Discrimination with the EEOC alleging race discrimination against Comcast.

16. On February 5, 2010, Plaintiff Tim Wharton filed a Charge of Discrimination with the EEOC alleging race discrimination against Comcast.

17. On October 28, 2011, the EEOC issued a Notice of Right to Sue for each of the individual Plaintiffs.

## CLASS MEMBERS

18. The proposed Class consists of all current or former African Americans employed at Comcast's South Side facility at any time from November of 2007 to the present who have been subject to discrimination in the terms or conditions of their employment. Additionally, the Class consists of all current or former African Americans employed at Comcast's South Side facility since January of 2005 to the present, or since prior to that time if the evidence demonstrates an ongoing continuing violation, who have been subject to a hostile work environment based on their race.

## DEFENDANT

19. Defendant Comcast employs approximately 102,000 persons worldwide and has its World Headquarters in Pennsylvania and is incorporated under the laws of that state.

20. Comcast is the largest cable operator and home internet service provider in the United States, providing both residential and commercial services in 39 states and the District of Columbia. In 2002, Comcast acquired the AT&T broadband cable system in Chicago.

21. Comcast operates several facilities in the Greater Chicago area, including the South Side Facility, a North Chicago Facility ("North Chicago" or "North Side"), and suburban locations including facilities in Winnetka, Romeoville, Elmhurst, Hickory Hills, Kankakee, Tinley Park, Aurora, and Homewood, among others (the "Suburban facilities").

22. The South Side facility provides cable services to customers within the following Chicago area: between 43rd Street and 142nd Street and between Harlem Avenue and South Shore Drive.

23. In the fiscal year 2010, Comcast's United States revenues were 37.9 billion dollars.

24. At all times pertinent to this action, Comcast has been doing business in Illinois by supplying services to customers and operating multiple offices and warehouses in Chicago and the Greater Chicago area. At all relevant times herein, Comcast has employed over five hundred individuals.

## HISTORY OF DISCRIMINATION AT THE SOUTH SIDE FACILITY

25. The eleven named Plaintiffs have been employed by Comcast and its predecessor for an average of 15 years.

26. In November of 2002, when Comcast Corporation acquired portions of AT&T's broadband cable business, each of the named Plaintiffs was working for AT&T and "rolled over" into Comcast.

27. Since at least 2005, employees at the South Side facility have complained repeatedly about disparate treatment—not just against the employees, but also against Comcast's South Side customers.

28. Employees at Comcast's South Side facility complained of, or managers observed that:

   a. The South Side facility was infested with cockroaches; employees would find cockroaches crawling in and out of equipment; the Human Resources manager had cockroaches in her office; cockroaches were found in employees' lockers, trucks, equipment bags, etc.

b.  there were rats in and around the South Side facility warehouse so frequently that employees assigned names to them;

c.  when it rained the South Side facility warehouse ceiling leaked;

d.  birds flew in and out of the South Side facility warehouse and left droppings throughout (including on at least one Plaintiff);

e.  South Side employees were required to install broken and/or infested equipment in customers' homes or businesses;

f.  the South Side facility was given the rejected, broken or rehabbed customer equipment that other offices had returned or refused to take;

g.  if customer equipment was returned and marked defective, employees were told to remove the defect sticker and send the equipment out to South Side customers;

h.  employees witnessed cockroach eggs fall out of cable boxes that they were supposed to install in customers' homes;

i.  when an employee complained about infested equipment he was forced to install in the Englewood area, a supervisor stated "just put the box in—you're in Englewood, they'll only have cable for a month, they won't pay bills";

j.  in response to a similar complaint, another manager stated it "didn't matter" because the equipment was going to Englewood;

k.  when another employee complained about the working conditions, his manager told him to "get your ass out in the field, don't complain, you have a job"

l.  employee requests for tools were ignored or delayed for months;

m.  because some employees were not given drills, they were instructed to run the cable through customers' windows;

n. one white employee at the South Side facility regularly referred to African Americans as "niggers" over a period of years;

o. South Side African American employees were referred to as "boy", "you people", and "thugs";

p. South Side African American employees were reportedly called "illiterate," "dumb black people," and "a bunch of blacks who [don't] know what they're doing";

q. South Side African American employees were referred to as "ghetto Tech" or "lazy Techs";

r. one South Side African American employee observed a Comcast work order that stated "send White Tech only";

s. South Side African American employees lacked the proper equipment and training to provide adequate services to the South Side customers;

t. on occasion when employees were given updated equipment, they would not receive the training to use the equipment;

u. the parking lot was unsafe and contained trash and a dirty port-a-potty;

v. South Side customers who came into the facility for customer service were subjected to filthy conditions and received substandard service, among other things.

29. In 2005, when several Plaintiffs complained of discrimination by a senior manager to Human Resources Manager Denise Davis ("Davis"), she passed the complaints up the chain of command, but no action was taken.

30. Instead, Davis was instructed by a Vice President of the Chicago Area to **not put discrimination complaints in writing**, in violation of Comcast's stated policy.

31. Between 2002 and 2010, Plaintiffs and other African American employees alerted the following individuals to the discriminatory conditions at the South Side facility: Human Resources Manager Denise Davis; Labor Attorney John Smith; Director of Maintenance Operations John Colucci; Area Vice President Sandy Weicher; Project Manager Bryan Mark; Human Resources Generalist Traci Barnes; Vice President of Engineering Don Fitzgerald; Area Vice President for City of Chicago Mark Allen; Director Tom Yates; Technical Operations Manager Eric Bos; Technical Operations Manager Sherman Henderson, supervisor Dave Johnson, and others.

32. In fact, supervisor Dave Johnson admitted in his statement to the EEOC that the Plaintiffs complained about race discrimination **two to three times a month**—over a period of years.

33. In late 2007, Plaintiffs and other African American employees sent a letter to Comcast Corporate headquarters complaining about the working conditions and stating in part:

> "[S]omeone in management is Prejudice toward Chicago South and we are being discriminated against";
>
> Referring to "PREJUDICE and DISCRIMINATION"; and stating that
>
> "[We are] doing a job without proper equipment, lack of respect from upper management, under staffed, discriminated against, no resolution to issues, [and] no training."

34. In response, Comcast Managers called Plaintiffs and other African American employees in the South Side who complained of discrimination "drama queens," "whiners," and "crybabies" and told the complainants—"do not say you're discriminated against—because you are not"—without having conducted any investigation.

35. Even after these complaints, Comcast refused to correct its discriminatory practices.

## CLASS ALLEGATIONS

## DEFINITION OF THE CLASS

36.  The proposed Class consists of all current or former African Americans employed at Comcast's South Side facility at any time from November of 2007 to the present who have been subject to discrimination in the terms or conditions of their employment.  Additionally, the Class consists of all current or former African Americans employed at Comcast's South Side facility since January of 2005 to the present, or since prior to that time if the evidence demonstrates an ongoing continuing violation, who have been subject to a hostile work environment based on their race.

## DISCRIMINATION IN WORKING TERMS AND CONDITIONS

37. Employees at Comcast's South Side facility are overwhelmingly African American.  The customers served by the South Side employees are predominantly African American.

### I.  FAILURE TO PROVIDE EQUAL WORKING CONDITIONS

38. When Plaintiffs filed their Charges of Discrimination with the EEOC, the South Side Facility was infested with rodents and cockroaches, was not temperature controlled, and contained numerous hazardous conditions including: high stacks of boxes, exhaust fumes, and ceiling tiles that fall onto working employees.  At that time, the South Side facility did not have a functioning parking lot or a training room.[1]

39. By contrast, the North Chicago facility, and Comcast's Suburban facilities, such as Winnetka, Romeoville, Elmhurst, Hickory Hills, Kankakee, Tinley Park, Aurora and Homewood (among others) which do not employ a majority of African Americans and/or do

---

[1]  South Chicago's office still does not have an actual training room.  There is a small non-equipped room that has been designated as a "Training Room" which is mostly used for storage.

not serve predominantly non-African American customers, were significantly better maintained than the South Side facility.

40. The South Side employees repeatedly complained about discrimination in their working conditions and no action was taken. Instead, managers responded to the complaints by laughing, calling the employees "cry babies," "whiners," and "drama queens" and warning them against using the word "discrimination." In fact, the Human Resources manager during much of the class period was specifically instructed to <u>not put complaints of discrimination in writing.</u>

41. South Side employees were repeatedly told that the facility would be repaired and renovated; however, no improvements occurred until 2009, after Plaintiffs filed charges with the EEOC. Even after the renovations, the South Side facility remains substandard when compared to the North Chicago or many of the Suburban facilities.

## II. FAILURE TO PROVIDE EQUAL TOOLS, EQUIPMENT AND UNIFORMS

42. Comcast refuses to provide South Side African American employees with the same tools, equipment and uniforms, as compared to North Chicago and/or Suburban facilities which do not employ majority African American employees and/or do not serve primarily African American customers.

**Line Technicians**

43. Line Technicians are responsible for repairing large-scale cable outages. In order to be able to diagnose and fix outage problems, Line Technicians require preventative maintenance tools and use of sophisticated equipment.

44. South Chicago Line Technicians are not provided with the same preventative maintenance tools given to similarly situated Line Technicians at the North Chicago and/or Suburban facilities. For example, the South Side Line Technicians often receive insufficient, defective and/or used amps, vault hooks, pin connectors, equalizers, splitters, etc., which make their jobs more difficult to perform and cause South Side customers to experience longer outages.

45. South Side Line Technicians are usually the last in the Chicago region to receive upgraded equipment and are often provided the "leftover" equipment from the North Chicago or Suburban offices.

46. A department called "Head End" receives the satellite signal for both North and South Chicago and sends the signal out to homes and businesses to ensure consistent cable service. The equipment that feeds the signal to South Chicago, as compared to North Chicago is outdated, resulting in inferior service to South Chicago customers.

47. For the Line Technicians to diagnose certain problems, they needed to speak with technicians at Head End. The Manager of Head End, however, refused to deal directly with the South Side Line Technicians, telling them "don't call me" or "lose my number." This same Manager referred to the South Side African American employees as "poor," "dummy" and "idiots."

48. Because the equipment that feeds the signal to South Chicago is inferior, South Side customers experience more outages and problems are more difficult to resolve.

49. For example, during 2008, Comcast's own records demonstrate that South Side Line Technicians had <u>twice</u> the number of problems requiring Head End assistance, compared to North Chicago.

50. Comcast's failure to provide necessary equipment to the Line Technicians makes it much more difficult for the South Side African American Line Technicians to perform their duties and causes South Side customers to experience longer outages.

**Service Technicians**

51. Service Technicians are responsible for installing and fixing equipment in South Chicago customers' homes or businesses. The Service Technicians bring cable boxes and/or other equipment to customers' homes or businesses where it is installed to allow for Comcast service. Service Technicians assigned to the South Side facility are not provided with the tools or equipment required to properly repair and install customer equipment.

52. Service Technicians assigned to the South Side facility are provided with used, defective, and/or cockroach infested equipment and are required to install such equipment into customers' homes. Often equipment is "recycled" from other areas and sent to the South Side, despite the fact that it is defective. South Side Service Technicians will return defective equipment to their managers, only to be given the same equipment again and forced to install it in another customer's home.

53. South Side Service Technicians frequently complained about the equipment they were forced to place in customer homes. Responses from Comcast managers included being told that the customer would be "evicted in a few months" and/or that South Side customers are more likely to steal equipment or not pay their bills.

54. Comcast also failed to provide Plaintiffs with the tools needed to properly install equipment into customer homes. For instance, Service Technicians are not given the proper equipment, including drills, to run wires into customers' homes. Service Techicians are therefore forced

to run wires through cracked windows (even during winter) to get service into their customers' homes.

55. Similarly situated employees at facilities that are not majority African American and/or do not serve predominantly African American customers are provided with the necessary tools and new customer equipment. Upon information and belief, these employees are not required to install used, defective, and/or infested equipment into customers' homes.

56. A Comcast supervisor refused to allow many South Side Service Technicians to take their vehicles home after reviewing their addresses and deciding they lived in "high risk" areas. This designation was based upon the supervisor's assessment that the Service Technicians lived in predominantly African American neighborhoods. Non-African American Service Technicians assigned to other facilities were not subject to such screening. Being denied the ability to take vehicles home made it more difficult for the South Side Service Technicians to perform their jobs.

57. Only after Plaintiffs filed Charges of Discrimination did Comcast modify this policy.

**Uniforms**

58. South Side Service and Line Technicians do not receive new uniforms when similarly situated employees at the North Chicago and/or Suburban facilities receive new uniforms.

59. South Side employees were often told that new uniforms were not available; many South Side Service and Line Technicians have not received updated uniforms in years. When South Side Service and Line Technicians do receive new uniforms, the uniforms are often for the wrong season; for instance, South Side Service and Line Technicians will receive winter uniforms during summer.

60. Upon information and belief, Comcast is less concerned with South Side employees' appearance because South Side employees serve predominantly African American customers.

### III. FAILURE TO PROVIDE EQUAL TRAINING AND PROMOTIONAL OPPORTUNITIES

61. South Side African American employees are denied the same training opportunities as other similarly situated Comcast employees. Comcast claims in its "Diversity in Recruitment" policy that Comcast "makes significant investments in career development" which includes sending employees to "Comcast University" for training.

62. The South Side African American employees are denied the same opportunities to receive "Comcast University" training. For example, Service Technicians who are "qualified" to move to the next position[2] are required to take a Comcast University course. Service Technicians can only attend a course, however, if their manager assigns them to do so and the South Side Technicians are regularly denied the opportunity for such training.

63. Upon information and belief, employees at the North Chicago and/or Suburban facilities are allowed to take Comcast University courses before South Side employees.

64. South Side African American employees are also denied (or are delayed in receiving) training on new or existing equipment.

65. Comcast's refusal to provide training restricts South Side employees' ability to progress into the next higher position and other promotional opportunities.

---

[2] Line Technicians and Service Technicians are formally referred to as "Comm Technicians" (or Comm Techs) by Comcast. The following job titles encompass Service Technicians: Comm Technician 1, Comm Technician 2, Comm Technician 3, Customer Comm Technician 4. Line Technicians are formally referred to as Network Comm Technicians 4 and Network Comm Technician 5.

15

66. In many instances, South Side African American employees no longer even apply for promotions because of a) the wide-spread belief that they will not be promoted because of their race; and/or b) because they are not aware of any promotional opportunities.

67. One example of this discrimination is with the "Head End" department serving South and North Chicago. These positions are preferred because they are better paid and the work is conducted indoors.

68. Prior to the filing of the Charges of Discrimination in September of 2008, 100% of the Head End technicians were non-African American.

69. At that time, the only two Line Technicians promoted from the South Side facility to Head End were less senior white Line Technicians. These promotions were given to these two employees despite the fact that, during this time frame, there were only five white employees in the South Side facility (and just 16 Hispanic employees), as compared to 169 African Americans.

70. Comcast's own promotional numbers suggest that African American employees throughout the Chicago area are promoted with dramatically less frequency than white employees.

71. For example, for the period of January 2007 through March of 2008, excluding those promotions at lower levels, which are mostly "automatic" (meaning there is no competitive and/or application process), promotions into the higher level positions are overwhelmingly non-African American, despite Comcast's assertion that 57% of Comcast's overall employee population for the Chicago area is African American.

72. Specifically, with respect to promotions into the Comm Technician 4 position, only two of 19 promotions went to African Americans; promotions into the Customer Comm Tech 4 positions, only one of four promotions went to African Americans; promotions into Network

Comm Tech 5, zero of two promotions went to African Americans; and with respect to "Other" higher level promotions, only five of 17 promotions went to African Americans. Thus, according to Comcast's own records, with respect to promotions into the highest positions in the Chicago area, less than 20% went to African Americans, although African Americans account for more than 55% of the workforce. On the other hand, white employees received more than 60% of the promotions although they account for only 26% of the employee population.

## IV. FAILURE TO PROVIDE EQUAL PAY AND EVALUATIONS

73. African American Line Technicians and Service Technicians at the South Side facility are subject to discrimination in their evaluations and therefore in their overall pay.

74. Line Technicians are evaluated in part on their abilities to fix outages and other technical problems; Comcast's failure to provide South Side Line Technicians with necessary equipment affects their ability to receive positive performance evaluations, pay raises and bonuses.

75. Service Technicians are evaluated in part on the number of times they have a "repeat" service visit—which is required after equipment is installed in a customer's home but is not working properly. Comcast's failure to provide South Side Service Technicians with necessary equipment affects their ability to receive positive performance evaluations, pay raises, and bonuses.

76. Many Service Technicians at the South Side facility were placed on "performance evaluation plans" because of their need to make repeat visits to repair faulty equipment.

## HOSTILE WORK ENVIRONMENT/RACIAL HARASSMENT

**Racial Harassment of Comcast Employees**

77.  African American employees are subjected to a racially hostile working environment by, among other things, being subjected to racially derogative language by non-African American managers and being subjected to disparate terms and conditions as described above.

78. The Manager of Head End refused to speak with or deal directly with the South Side Line Technicians, telling them "don't call me" or "lose my number" and referred to the South Side African American employees as "poor," "dummy," and "idiots."

79. Comcast Supervisor Marc Espinosa ("Espinosa") also refused to assist South Side Line and Service Technicians and stated "they say you guys are illiterate."

80. Other Comcast Managers or employees referred to African Americans as "nigger," "boy," "illiterate," and "dumb black people."

81. Supervisors and co-workers refer to African American Line and Service Technicians as the "ghetto Techs" or "lazy Techs."

82. Service and Line Technicians call Dispatchers at Head End to report service problems and receive assistance in diagnosing and repairing problems. The Lead Dispatcher at Head End referred to South Side Technicians as "you people," and commented to South Side Technicians, "I see why they [are] saying you guys are stupid," and "I see why they're saying you people don't know what you're doing." Additionally, the Lead Dispatcher informed South Side Service Technicians that Comcast supervisors referred to them as, "a bunch of black guys who don't know what [they are] doing."

83. This treatment interfered with the African American employees' ability to perform their jobs.

**Discrimination Against Black Customers Creates Hostile Environment for Employees**

84. Comcast discriminates against its African American customers, contributing to the employees' racially hostile working environment.

85. Comcast knowingly treats its South Side African American customers with disdain by providing broken and infested equipment and referring to South Side customers as "poor" or "poor black people."  When employees complained, they were told that the customer would most likely be evicted in a few months and/or that customers served by the South Side facility are more likely to steal equipment or not pay their bills.

86. Because of the lack of tools given to the South Side employees, they would sometimes have to run wires through cracked windows (even during winter) to get service into their customers' homes.

87. Despite repeated complaints of harassment and a hostile working environment to numerous management officials, Comcast has not adequately addressed or responded to these complaints or otherwise remedied or prevented the discrimination.

## CLASS REQUIREMENTS MET

88. The individuals in the Class are so numerous that joinder of all members is impracticable. Plaintiffs estimate that there are at least 200 Class members and may be as many as 350 members of the Class.

89. There are questions of law and fact common to the Class that predominate over any questions affecting only individuals.  Among these common questions are:

    a. Whether Comcast's actions violated federal civil rights laws, including Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 (e) *et seq.* ("Title

VII"), Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981 (a), and the Civil Rights Act of 1866, 42 U.S.C. §1981;

b.  Whether Comcast discriminated against employees at the South Side location by 1) forcing class members to work in substandard facilities which were infested with cockroaches and rats; 2) forcing South Side employees to install infested and/or defective equipment into its customers' homes or businesses and denying them other necessary equipment and tools required to provide adequate service to its customers; 3) failing to provide training and to promote South Side African American employees into higher level positions; 4) failing to provide equal pay and fair evaluations to South Side African American employees; and 5) subjecting South Side African American employees to a hostile work environment;

c.  Whether there are statistically significant disparities between the placement, and compensation awarded to African American employees and the placement and compensation awarded to similarly situated non-African American employees, sufficient to permit an inference of intentional discrimination;

d.  Whether Comcast maintains written and unwritten policies and/or practices for determining promotions that discriminate against the Class on the basis of race;

e.  Whether there are statistically significant disparities between the promotions awarded to African American employees and promotions awarded to similarly situated non-African American employees, sufficient to permit an inference of intentional discrimination;

f.  Whether Comcast maintains and fails to remedy or prevent a hostile working environment for its African American employees;

g.  If discrimination is found, whether injunctive relief, including changes to company-wide written and unwritten policies and practices is needed to adequately remedy past and present discrimination against the Class and prevent future discrimination against the Class;

h.  Whether Comcast's conduct constitutes a pattern of discrimination against the Class justifying an award of lost wages, benefits, or other similar relief to individual members of the Class; and

i.  Whether Comcast's conduct constitutes a pattern of discrimination against the Class justifying an award of compensatory and punitive damages to individual members of the Class.

90. The claims of the representative parties are typical of the claims of the Class. The named Plaintiffs will fairly and adequately represent the interests of the Class.

91. The named Plaintiffs have retained skilled and experienced counsel to represent the Class in this litigation.

92. Comcast has acted or refused to act on grounds generally applicable to the Class, making final injunctive or declaratory relief appropriate.

93. A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

94. Issues common to the class predominate over individual issues.

## INDIVIDUAL NAMED PLAINTIFFS' CLAIMS

**Line Technicians**

### James Brand's Individual Claims

95. Plaintiff Brand currently works for Comcast as a Line Technician in the South Side facility. He has been employed by Comcast or its predecessor for more than 20 years.

96. During his employment with Comcast, Plaintiff Brand has been subjected to discrimination due to his race. Examples of this discrimination include:

    (a) Being subjected to discriminatory working terms and conditions, as alleged with regard to the entire class in Paragraphs 37-41. On at least four occasions, Plaintiff Brand asked Director Tom Yates ("Yates") if the South Side facility was kept in disrepair because the majority of employees were African American. Each time, Yates responded by laughing at the question;

    (b) Being denied equal access to tools, equipment and uniforms, as alleged with regard to the entire class in Paragraphs 42-60;

    (c) Being denied the same promotional and training opportunities as other similarly situated Comcast employees, as alleged with regard to the entire class in Paragraphs 61-72. In particular, Plaintiff Brand was denied promotions to Head End positions, while non-African American employees who were less qualified and who had less tenure with Comcast were readily hired into those better-paying service center positions. Plaintiff Brand applied for a promotion at Head End in approximately 2003. When Brand spoke to Head End manager and decision maker George Tomack ("Tomack") over the phone about the promotion, Tomack encouraged Plaintiff Brand to come in for an interview. When Plaintiff Brand arrived for his interview and

22

Tomack observed he was African American, Tomack refused to interview Plaintiff Brand and told him and another African American candidate, "you guys won't fit in here," and, "I don't want to waste your time." Plaintiff Brand reported the incident to Yates, Vice President Mark Allen ("Allen"), supervisor John Calucci ("Calucci"), and Human Resources Manager Denise Davis ("Davis"). Davis responded, "what do you want me to do?" Plaintiff Brand did not apply for subsequent promotions because it was clear African American employees would not be considered for Head End positions;

(d) Being denied equal pay and evaluations, as alleged with regard to the entire class in Paragraphs 73-76. Upon information and belief, Plaintiff Brand receives a lower base rate of pay than similarly situated employees at the North Chicago and Suburban facilities. Plaintiff Brand was told by supervisors that his base rate of pay was "maxed out." Plaintiff Brand requested Davis provide South Side employees with Comcast's wage scale approximately four times; Davis told Plaintiff Brand she would "get back to [him]." Davis never provided the information to Plaintiff Brand;

(e) Being subjected to a hostile work environment, as alleged with regard to the entire class in Paragraphs 77-87; and

(f) Being subjected to retaliation after complaining of discrimination, in particular, being refused Head End services by George Tomack, which Plaintiff Brand required to adequately perform his job.

97. Similarly-situated non-African American employees were not subjected to such discrimination and received more favorable treatment in the terms and conditions of their employment with Comcast, due to their race.

98. Comcast was aware of Plaintiff Brand's complaints, but failed to take any corrective action to remedy or prevent the discrimination.

## Marvin Cooper's Individual Claims

99. Plaintiff Cooper worked for Comcast as a Line Technician in the South Side facility. He was employed by Comcast or its predecessor for almost 20 years. After filing a Charge of Discrimination and a Workers' Compensation claim, Plaintiff Cooper was fired on March 20, 2009.

100. During his employment with Comcast, Plaintiff Cooper was subjected to discrimination due to his race. Examples of this discrimination include:

    (a) Being subjected to discriminatory working terms and conditions, as alleged with regard to the entire class in Paragraphs 37-41;

    (b) Being denied equal access to tools, equipment and uniforms, as alleged with regard to the entire class in Paragraphs 42-60;

    (c) Being denied the same promotional and training opportunities as other similarly situated Comcast employees, as alleged with regard to the entire class in Paragraphs 61-72. Plaintiff Cooper was deterred from applying for promotions to better-paying Head End positions because it was clear that African American employees would not be considered for such promotions;

    (d) Being denied equal pay and evaluations, as alleged with regard to the entire class in Paragraphs 73-76. Upon information and belief, Plaintiff Cooper received a lower base rate of pay than similarly situated employees at the North Chicago and Suburban facilities;

(e) Being subjected to a hostile work environment, as alleged with regard to the entire class in Paragraphs 77-87; and

(f) Plaintiff Cooper was retaliated against for complaining about the discriminatory actions described above and for filing a Charge of Discrimination with the EEOC in 2008. On March 20, 2009, after being placed on administrative leave for several months, Plaintiff Cooper was terminated by Comcast for alleged high fuel usage with his company vehicle. In the months leading up to his termination, however, Plaintiff Cooper worked unusually long hours and extensive overtime hours. The nature of Plaintiff Cooper's work assignments required him to keep his company vehicle running in one place, meaning his "bucket truck's" (a truck known to have fuel consumption issues) fuel consumption did not always reflect actual miles driven. Before Plaintiff Cooper was terminated, Comcast did not verify the issues with his company vehicle even though those issues could have been confirmed by his supervisor, the Fleet Department, and several maintenance record sheets from 2008-2009. Upon information and belief, Comcast terminated Plaintiff Cooper in retaliation for his organization and participation in charges filed against Comcast in 2008. Plaintiff Cooper was subjected to other retaliation after complaining of discrimination, in particular, being refused Head End services by George Tomack, which Plaintiff Cooper required to adequately perform his job.

101. Similarly-situated non-African American employees were not subjected to such discrimination and received more favorable treatment in the terms and conditions of their employment with Comcast, due to their race.

102. Comcast was aware of Plaintiff Cooper's complaints, but failed to take any corrective action to remedy or prevent the discrimination.

### Harold Gunn's Individual Claims

103. Plaintiff Gunn works for Comcast as a Line Technician in the South Side facility.   He has been employed by Comcast or its predecessor for a total of approximately 22 years.

104.  During his employment with Comcast, Plaintiff Gunn has been subjected to discrimination due to his race.  Examples of this discrimination include:

    (a)  Being subjected to discriminatory working terms and conditions, as alleged with regard to the entire class in Paragraphs 37-41;

    (b)  Being denied equal access to tools, equipment and uniforms, as alleged with regard to the entire class in Paragraphs 42-60;

    (c)  Being denied the same promotional and training opportunities as other similarly situated Comcast employees, as alleged with regard to the entire class in Paragraphs 61-72;

    (d)  Being denied equal pay and evaluations, as alleged with regard to the entire class in Paragraphs 73-76. Upon information and belief, Plaintiff Gunn received a lower base rate of pay than similarly situated employees at the North Chicago and Suburban facilities;

    (e)  Being subjected to a hostile work environment, as alleged with regard to the entire class in Paragraphs 77-87; and

    (f)  Being subjected to retaliation after complaining of discrimination, in particular, being refused Head End services by George Tomack, which Plaintiff Gunn required to adequately perform his job.

105. Similarly situated non-African American employees were not subjected to such discrimination and received more favorable treatment in the terms and conditions of their employment with Comcast, due to their race.

106. Comcast was aware of Plaintiff Gunn's complaints, but failed to take any corrective action to remedy or prevent the discrimination

## **Kevin Jackson's Individual Claims**

107. Plaintiff Jackson works for Comcast as a Line Technician in the South Side facility. He has been employed by Comcast or its predecessor for a total of approximately 18 years.

108. During his employment with Comcast, Plaintiff Jackson has been subjected to discrimination due to his race. Examples of this discrimination include:

 (a) Being subjected to discriminatory working terms and conditions, as alleged with regard to the entire class in Paragraphs 37-41;

 (b) Being denied equal access to tools, equipment and uniforms, as alleged with regard to the entire class in Paragraphs 42-60;

 (c) Being denied the same promotional and training opportunities as other similarly situated Comcast employees, as alleged with regard to the entire class in Paragraphs 61-72. Additionally, Plaintiff Jackson was deterred from applying for promotions to better paying Head End positions because Plaintiff Jackson knew decision maker Tomack would not promote an African American candidate. Non-African American employees who were less qualified and who had less tenure with Comcast were readily hired into those better-paying service center positions

 (d) Being denied equal pay and evaluations, as alleged with regard to the entire class in Paragraphs 73-76. Upon information and belief, Plaintiff Jackson received a lower

base rate of pay than similarly situated employees at the North Chicago and Suburban

facilities;

(e)  Being subjected to a hostile work environment, as alleged with regard to the entire

class in Paragraphs 77-87; and

(f)  Being subjected to retaliation after complaining of discrimination, in particular, being

refused Head End services by George Tomack, which Plaintiff Jackson required to

adequately perform his job.

109. Similarly situated non-African American employees were not subjected to such

discrimination and received more favorable treatment in the terms and conditions of their

employment with Comcast, due to their race.

110. Comcast was aware of Plaintiff Jackson's complaints, but failed to take any corrective

action to remedy or prevent the discrimination

**Service Technicians**

<u>**Michael Dickens' Individual Claims**</u>

111. Plaintiff Dickens currently works for Comcast as a Service Technician in the South Side

facility.  He has been employed by Comcast or its predecessor for a total of approximately

13 years.

112. During his employment with Comcast, Plaintiff Dickens has been subjected to

discrimination due to his race. Examples of this discrimination include:

(a)  Being subjected to discriminatory working terms and conditions, as alleged with

regard to the entire class in Paragraphs 37-41;

(b)  Being denied equal access to tools, equipment and uniforms, as alleged with

regard to the entire class in Paragraphs 42-60. Additionally, Plaintiff Dickens is

provided with used, defective, and/or infested equipment which he is required to install into customers' homes on the South Side. The equipment is "recycled" from other areas and sent to the South Side despite being defective. Employees assigned to the North Chicago facility commented to Plaintiff Dickens, "we send you all the scraps" in reference to inferior equipment provided to South Side customers. Because South Side customers are provided with inferior equipment, Plaintiff Dickens often has to respond to "repeat" calls to attempt to repair the equipment;

(c) Being denied the same promotional and training opportunities as other similarly situated Comcast employees, as alleged with regard to the entire class in Paragraphs 61-72;

(d) Being denied equal pay and evaluations, as alleged with regard to the entire class in Paragraphs 73-76. Upon information and belief, Plaintiff Dickens receives a lower base rate of pay than similarly situated non-African American employees. Plaintiff Dickens was told by a supervisor that he was "maxed out" and could not receive a higher wage. Plaintiff Dickens requested Comcast's pay scale from Human Resources but was not provided with one; and

(e) Being subjected to a hostile work environment, as alleged with regard to the entire class in Paragraphs 77-87.

113. Similarly-situated non-African American employees were not subjected to such discrimination and received more favorable treatment in the terms and conditions of their employment with Comcast, due to their race.

114. Comcast was aware of Plaintiff Dickens' complaints, but failed to take any corrective action to remedy or prevent the discrimination.

## Isaiah Elder's Individual Claims

115. Plaintiff Elder currently works for Comcast as a Service Technician in the South Side facility. He has been employed by Comcast or its predecessor for a total of approximately 14 years.

116. During his employment with Comcast, Plaintiff Elder has been subjected to discrimination due to his race. Examples of this discrimination include:

    (a) Being subjected to discriminatory working terms and conditions, as alleged with regard to the entire class in Paragraphs 37-41;

    (b) Being denied equal access to tools, equipment and uniforms, as alleged with regard to the entire class in Paragraphs 42-60. Additionally, Plaintiff Elder is provided with used, defective, and/or infested equipment which he is required to install into customers' homes on the South Side. The equipment is "recycled" from other areas and sent to the South Side despite being defective. Because South Side customers are provided with inferior equipment, Plaintiff Elder often has to respond to "repeat" calls to attempt to repair the equipment;

    (c) Being denied the same promotional and training opportunities as other similarly situated Comcast employees, as alleged with regard to the entire class in Paragraphs 61-72;

    (d) Being denied equal pay and evaluations, as alleged with regard to the entire class in Paragraphs 73-76. Upon information and belief, Plaintiff Elder receives a lower base rate of pay than similarly situated non-African American employees;

    (e) Being subjected to a hostile work environment, as alleged with regard to the entire class in Paragraphs 77-87; and

(f) Plaintiff Elder was subjected to retaliatory treatment for complaining about the discriminatory treatment by Comcast. After Plaintiff Elder filed a Charge of Discrimination with the EEOC in 2008, he was disciplined on two different occasions for infractions that similarly situated individuals who did not file charges were not disciplined for. These infractions included failing to follow "policy" after changing a flat tire. On another occasion, Comcast supervisor Daniel Payne attempted to discipline Plaintiff Elder for lying about his whereabouts during the work day; this allegation was untrue.

117. Similarly-situated non-African American employees were not subjected to such discrimination and received more favorable treatment in the terms and conditions of their employment with Comcast, due to their race.

118. Comcast was aware of Plaintiff Elder's complaints, but failed to take any corrective action to remedy or prevent the discrimination

### Donald Hart's Individual Claims

119. Plaintiff Hart currently works for Comcast as a Service Technician in the South Side facility. He has been employed by Comcast or its predecessor for a total of approximately 14 years.

120. During his employment with Comcast, Plaintiff Hart has been subjected to discrimination due to his race. Examples of this discrimination include:

(a) Being subjected to discriminatory working terms and conditions, as alleged with regard to the entire class in Paragraphs 37-41;

(b) Being denied equal access to tools, equipment and uniforms, as alleged with regard to the entire class in Paragraphs 42-60. Additionally, Plaintiff Hart is provided with

used, defective, and/or infested equipment which he is required to install into customers' homes on the South Side. The equipment is "recycled" from other areas and sent to the South Side despite being defective. Because South Side customers are provided with inferior equipment, Plaintiff Hart often has to respond to "repeat" calls to attempt to repair the equipment;

(c) Being denied the same promotional and training opportunities as other similarly situated Comcast employees, as alleged with regard to the entire class in Paragraphs 61-72;

(d) Being denied equal pay and evaluations, as alleged with regard to the entire class in Paragraphs 73-76. Upon information and belief, Plaintiff Hart receives a lower base rate of pay than similarly situated non-African American employees; and

(e) Being subjected to a hostile work environment, as alleged with regard to the entire class in Paragraphs 77-87;

121. Similarly-situated non-African American employees were not subjected to such discrimination and received more favorable treatment in the terms and conditions of their employment with Comcast, due to their race.

122. Comcast was aware of Plaintiff Hart's complaints, but failed to take any corrective action to remedy or prevent the discrimination.

### **Shannon Jordan's Individual Claims**

123. Plaintiff Jordan currently works for Comcast as a Service Technician in the South Side facility. He has been employed by Comcast or its predecessor for a total of approximately 10 years.

124. During his employment with Comcast, Plaintiff Jordan has been subjected to discrimination due to his race. Examples of this discrimination include:

    (a) Being subjected to discriminatory working terms and conditions, as alleged with regard to the entire class in Paragraphs 37-41;

    (b) Being denied equal access to tools, equipment and uniforms, as alleged with regard to the entire class in Paragraphs 42-60. Additionally, Plaintiff Jordan is provided with used, defective, and/or infested equipment which he is required to install into customers' homes on the South Side. The equipment is "recycled" from other areas and sent to the South Side despite being defective. Because South Side customers are provided with inferior equipment, Plaintiff Jordan often has to respond to "repeat" calls to attempt to repair the equipment;

    (c) Being denied the same promotional and training opportunities as other similarly situated Comcast employees, as alleged with regard to the entire class in Paragraphs 61-72;

    (d) Being denied equal pay and evaluations, as alleged with regard to the entire class in Paragraphs 73-76. Upon information and belief, Plaintiff Jordan receives a lower base rate of pay than similarly situated non-African American employees;

    (e) Being subjected to a hostile work environment, as alleged with regard to the entire class in Paragraphs 77-87; and

    (f) Plaintiff Jordan was subjected to retaliatory treatment for complaining about the discriminatory treatment by Comcast. In November 2010, Comcast supervisor Dan Payne refused to allow Plaintiff Jordan to have a Human Resources representative present during a disputed disciplinary meeting, in contradiction with Comcast

company policy. When Plaintiff Jordan declined to participate in the meeting without someone from Human Resources present, Payne falsely claimed to Comcast security that Plaintiff Jordan had threatened him.

125. Similarly situated non-African American employees were not subjected to such discrimination and received more favorable treatment in the terms and conditions of their employment with Comcast, due to their race.

126. Comcast was aware of Plaintiff Jordan's complaints, but failed to take any corrective action to remedy or prevent the discrimination.

### Sherman Peterson's Individual Claims

127. Plaintiff Peterson worked for Comcast as a Service Technician in the South Side facility until August 2011. In August 2011, after several attempts and after the Charges of Discrimination were filed, he was promoted to a Line Technician and moved to the Chicago North facility. He has been employed by Comcast or its predecessor for a total of approximately 15 years.

128. During his employment with Comcast, Plaintiff Peterson has been subjected to discrimination due to his race. Examples of this discrimination include:

    (a) Being subjected to discriminatory working terms and conditions, as alleged with regard to the entire class in Paragraphs 37-41;

    (b) Being denied equal access to tools, equipment and uniforms, as alleged with regard to the entire class in Paragraphs 42-60. Additionally, while a Service Technician, Plaintiff Peterson was provided with used, defective, and/or infested equipment which he was required to install into customers' homes on the South Side. The equipment is "recycled" from other areas and sent to the South Side despite being

defective. Because South Side customers are provided with inferior equipment, Plaintiff Peterson often had to respond to "repeat" calls to attempt to repair the equipment. When Plaintiff Peterson complained about the faulty equipment to supervisor Derrick Bass, he was told, "just put the box in—you're in Englewood, they'll only have cable for a month, they won't pay bills." Plaintiff Peterson understood this to mean that African American customers were unable to afford cable. Comcast's supervisors instructed Plaintiff Peterson to take ten boxes if he needed to install five, because it was likely that at least half the boxes would contain faulty equipment;

(c) Being denied the same promotional and training opportunities as other similarly situated Comcast employees, as alleged with regard to the entire class in Paragraphs 61-72;

(d) Being denied equal pay and evaluations, as alleged with regard to the entire class in Paragraphs 73-76; and

(e) Being subjected to a hostile work environment, as alleged with regard to the entire class in Paragraphs 77-87.

129. Similarly-situated non-African American employees were not subjected to such discrimination and received more favorable treatment in the terms and conditions of their employment with Comcast, due to their race.

130. Comcast was aware of Plaintiff Peterson's complaints, but failed to take any corrective action to remedy or prevent the discrimination

## Cyrus Robinson's Individual Claims

131. Plaintiff Robinson works for Comcast as a Service Technician in the South Side facility. He has been employed by Comcast or its predecessor for a total of approximately 17 years.

132. During his employment with Comcast, Plaintiff Robinson has been subjected to discrimination due to his race. Examples of this discrimination include:

(a) Being subjected to discriminatory working terms and conditions, as alleged with regard to the entire class in Paragraphs 37-41. When Plaintiff Robinson complained about the inferior facility to Yates, Yates responded, "get your ass in the field, don't complain, you have a job";

(b) Being denied equal access to tools, equipment and uniforms, as alleged with regard to the entire class in Paragraphs 42-60. Additionally, Plaintiff Robinson is provided with used, defective, and/or infested equipment which he is required to install into customers' homes on the South Side. The equipment is "recycled" from other areas and sent to the South Side despite being defective. Because South Side customers are provided with inferior equipment, Plaintiff Robinson often has to respond to "repeat" calls to attempt to repair the equipment. When Plaintiff Robinson complained to a supervisor about the broken and infested equipment, he was told, "it doesn't matter, it's going to Englewood." Plaintiff Robinson understood this to mean that customers in predominantly African American neighborhoods received inferior equipment;

(c) Being denied the same promotional and training opportunities as other similarly situated Comcast employees, as alleged with regard to the entire class in Paragraphs 61-72;

(d) Being denied equal pay and evaluations, as alleged with regard to the entire class in Paragraphs 73-76. Upon information and belief, Plaintiff Robinson receives a lower base rate of pay than similarly situated non-African American employees. Plaintiff Robinson requested Comcast's pay scale from Davis but was informed it was not available; and

(e) Being subjected to a hostile work environment, as alleged with regard to the entire class in Paragraphs 77-87.

133. Similarly-situated non-African American employees were not subjected to such discrimination and received more favorable treatment in the terms and conditions of their employment with Comcast, due to their race.

134. Comcast was aware of Plaintiff Robinson's complaints, but failed to take any corrective action to remedy or prevent the discrimination

### **Tim Wharton's Individual Claims**

135. Plaintiff Wharton works for Comcast as a Service Technician in the South Side facility. He has been employed by Comcast or its predecessors for a total of approximately 13 years.

136. During his employment with Comcast, Plaintiff Wharton has been subjected to discrimination due to his race. Examples of this discrimination include:

(a) Being subjected to discriminatory working terms and conditions, as alleged with regard to the entire class in Paragraphs 37-41;

(b) Being denied equal access to tools, equipment and uniforms, as alleged with regard to the entire class in Paragraphs 42-60. Plaintiff Wharton is assigned to work in the warehouse that distributes equipment for installation in customers' homes to Service Technicians. Plaintiff Wharton is forced to provide equipment that is used, defective,

37

and/or cockroach infested. The equipment is "recycled" from other areas and sent to the South Side despite being defective. Although defective equipment is marked with stickers when it returns to the warehouse, Comcast's supervisors instructed Plaintiff Wharton to remove the stickers and reissue the equipment to customers on the South Side. Tomack stated to Plaintiff Wharton, "if [the equipment] didn't work, it works now" in reference to the malfunctioning equipment. By contrast, Plaintiff Wharton witnessed brand new equipment being repeatedly provided to the North Chicago facility for customer distribution;

(c) Being denied the same promotional and training opportunities as other similarly situated Comcast employees, as alleged with regard to the entire class in Paragraphs 61-72;

(d) Being denied equal pay and evaluations, as alleged with regard to the entire class in Paragraphs 73-76. Upon information and belief, Plaintiff Wharton receives a lower base rate of pay than similarly situated non-African American employees; and

(e) Plaintiff Wharton is subjected to a hostile work environment, as alleged with regard to the entire class in Paragraphs 77-87;

137. Similarly situated non-African American employees were not subjected to such discrimination and received more favorable treatment in the terms and conditions of their employment with Comcast, due to their race.

138. Comcast was aware of Plaintiff Wharton's complaints, but failed to take any corrective action to remedy or prevent the discrimination.

## COUNT ONE:  DISCRIMINATION AGAINST THE NAMED PLAINTIFFS AND THE CLASS IN VIOLATION OF SECTION 1981

139. Plaintiffs repeat and re-allege each and every allegation above as if set forth herein in full.

140.  Comcast has intentionally discriminated against Plaintiffs and the Class in violation of Section 1981 by engaging in the following acts 1) forcing class members to work in substandard facilities which were infested with cockroaches and rats; 2) forcing South Side employees to install infested and/or defective equipment to its customers and denying them other necessary equipment and tools required to provide adequate service to its customers; 3) failing to provide training and to promote South Side African American employees into higher level positions; 4) failing to provide equal pay and fair evaluations to South Side African American employees; and 5) subjecting South Side African American employees to hostile work environment by: referring to African American employees in a racially derogatory manner, applying workplace rules and regulations in a racially biased manner, falsely assuming that equipment given to African American employees would be stolen, instructing African American employees to follow different protocol from similarly situated non-African American employees when placing service calls,  and failing to provide African American employees with facilities that would allow equal levels of service as to the facilities of non-African American employees.

## COUNT TWO:  DISCRIMINATION AGAINST THE NAMED PLAINTIFFS AND THE CLASS IN VIOLATION OF TITLE VII

141. Plaintiffs repeat and re-allege each and every allegation above as if set forth herein in full.

142. Defendant has intentionally discriminated against Plaintiffs and the Class in violation of Title VII by engaging in the following acts 1) forcing class members to work in substandard

facilities which were infested with cockroaches and rats; 2) forcing South Side employees to install infested and/or defective equipment to its customers and denying them other necessary equipment and tools required to provide adequate service to its customers; 3) failing to provide training and to promote South Side African American employees into higher level positions; 4) failing to provide equal pay and fair evaluations to South Side African American employees; and 5) subjecting South Side African American employees to hostile work environment by: referring to African American employees in a racially derogatory manner, applying workplace rules and regulations in a racially biased manner, falsely assuming that equipment given to African American employees would be stolen, instructing African American employees to follow different protocol from similarly situated non-African American employees when placing service calls,  and failing to provide African American employees with facilities that would allow equal levels of service as to the facilities of non-African American employees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class respectfully request that this Court grant the following relief:

a.  Certification of the Class;

b.  Enter a judgment that Defendant's acts and practices as set forth herein are in violation of the laws of the United States;

c.  Enter preliminary and permanent relief enjoining the discriminatory conduct necessary to end Defendant's discriminatory practices and prevent current and future harm to Plaintiffs and the Class;

d.  Award Plaintiffs and the Class lost wages, including back pay, front pay and lost benefits, and including, without limitation, any lost benefits that would otherwise have been available to the Plaintiffs and Class without the discrimination;

e.  Award Plaintiffs and the Class compensatory and punitive damages;

f.  Award reinstatement to those Plaintiffs and Class members who prove discriminatory discharge;

g.  Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and

h.  Grant Plaintiffs and the Class such other and further relief as this Court finds necessary and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues of facts and damages in this action.

RESPECTFULLY SUBMITTED,


/Noelle Brennan/
By One of Plaintiffs' Attorneys

Noelle Brennan
Sarah Brown
Danielle Hoffmann
NOELLE BRENNAN & ASSOCATES, LTD.
20 S. Clark Street
Suite 1530
Chicago, IL 60603
(312) 422-0001
(312) 422-0008 (fax)

Randall D. Schmidt
The University of Chicago Law School
Edwin F. Mandell Legal Aid Clinic
6020 S. University Ave.
Chicago, Illinois 60637
(773) 702-9611
(773) 702-2063 (fax)