**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JAMES BRAND, on behalf of himself and all others similarly situated,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **Case No. 11 C 8471** |
| **COMCAST CORPORATION, INC.,** | ) ) | |
| **Defendant.** | ) ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

James Brand and eleven others, on behalf of a putative class of African-American employees employed at the South Side Chicago facility of defendant Comcast Corporation, Inc., filed suit against Comcast, alleging discrimination under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964. Plaintiffs have also moved to certify their putative class. Plaintiffs and Comcast have each filed motions to strike or bar the declarations, reports, and testimony of witnesses for the opposing party. For the reasons stated below, the Court grants plaintiffs' motion for class certification in part. The Court also denies each side's motions to strike the reports, declarations, and testimony of the other side's witnesses.

### Background

The Court takes the following facts from plaintiffs' amended complaint. Comcast is a cable television and home Internet provider that operates several facilities in the Chicago area. The twelve named plaintiffs are Comcast employees who work or

worked out of the company's facility on South 112th Street in Chicago. Four of the plaintiffs are or were line technicians for Comcast, and eight are or were service technicians. Plaintiffs allege that the workforce at 112th Street is ninety percent African-American and that Comcast discriminated against the employees at the facility because of the race of the employees and their customers.

Among the named plaintiffs, the average length of employment at Comcast (including its predecessor company, AT&T) is fifteen years. Plaintiffs assert that they have made complaints about their treatment at the 112th Street facility since 2005. Among the topics of their complaints, they contend, were that the facility was infested with cockroaches and other vermin; the facility itself was dilapidated and dangerous; the equipment they received to install for customers was defective, used, or infested with vermin; their requests for equipment were ignored or not timely responded to; and they did not receive adequate training. *See* 2d Am. Compl. ¶ 28. Plaintiffs also contend that they heard or were called various racial epithets, including "nigger," "boy," "you people," "thugs," "ghetto," and "lazy." *Id.* ¶ 28(n)–(q). They contend that they made various complaints to Comcast management about these concerns, which were ignored.

Furthermore, as a result of the poor equipment and lack of training, plaintiffs say they "were issued unfair discipline which led to reduced promotional and/or training opportunities, negative evaluations, less pay, and, in some cases termination." *Id.* ¶ 28(w). They expand upon these allegations in their memorandum supporting their class certification motion. There, in addition to the allegations listed above, plaintiffs contend that statistical evidence shows they were promoted less frequently than white Comcast workers, using evidence of examination passage rates for African-Americans

2

at 112th street as compared with white employees at Comcast's suburban Chicago locations.  Plaintiffs also make pay comparisons between the two groups, arguing that they were on average paid less than white suburban Comcast employees.  Plaintiffs further allege they were more likely to be placed on disciplinary performance improvement plans and that they were disproportionately terminated.

In their amended complaint, plaintiffs acknowledge that the 112th Street facility was renovated in 2009 but argue this did not occur until after they filed charges against Comcast with the Equal Employment Opportunity Commission.  Even after the renovation, plaintiffs contend, the facility remains "substandard when compared to the North Chicago or many of the Suburban facilities." *Id.* ¶ 41.  In general, plaintiffs say, Comcast's facilities in Chicago suburbs such as Mount Prospect and Kankakee were better maintained than the 112th Street facility.

Plaintiffs propose a hostile work environment class consisting of all African-American employees who work or worked at Comcast's 112th Street facility between January 2005 and the present.  They also propose a terms and conditions class, consisting of African-American employees who worked at the 112th Street facility between November 2007 and the present.  Plaintiffs also propose three other classes, which they refer to as subclasses, consisting of African-American employees at the 112th Street facility who they claim experienced discriminatory promotions, pay, or discipline.  In support of and in opposition to plaintiffs' motion, each side has submitted reports from certain expert or summary witnesses.

3

**Discussion**

**A.    Motions to strike reports and testimony of experts and declarants**

Comcast has moved to strike the report and preclude the testimony of plaintiffs' witnesses Michael Campion and Eric Blank.  Plaintiffs have moved to bar the reports and testimony of Comcast's witness Bernard Siskin and to strike the declaration of Comcast's witness Patricia Kelly.

A district court performs "a gatekeeping role" in evaluating the admissibility of expert testimony.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Federal Rule of Evidence 702 permits testimony by "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" so long as

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

If an "expert's report or testimony is critical to class certification," the court "must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on [the] class certification motion."  *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010).  The Seventh Circuit has stated that the word "critical" in that statement is intended "to describe expert testimony important to an issue decisive for the motion for class certification."  *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 812 (7th Cir. 2012).

In making this determination, "the district court must ascertain whether the expert

is qualified, whether his or her methodology is scientifically reliable, and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011) (quoting Fed. R. Evid. 702). The Rule 702 inquiry "is, we emphasize, a flexible one," *Daubert*, 509 U.S. at 594–95, and a district court has "broad latitude" in making its determination. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999). Nonetheless, a court must focus "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 594–95.

### 1.    Campion (witness for plaintiffs)

Plaintiffs have submitted the report of Michael Campion, a professor of management at Purdue University. Campion's report criticizes the conclusions of Comcast's expert Siskin along with the data Comcast made available on pay and promotions. Campion also concludes that Comcast's black employees are paid less than white employees in the greater Chicago region, as are black workers at the 112th Street facility when compared to white Comcast workers in the Chicago suburbs and as are all black workers at Comcast facilities within Chicago compared to all white suburban Comcast workers. Comcast contends that Campion is not qualified as an expert in statistics; he bases his analysis on mistaken assumptions; he incorrectly focused on disparities across Comcast facilities; and he made errors such as use of a disparate impact test even though plaintiffs are using a disparate treatment theory.

### a.    Qualifications

In ascertaining whether an expert is qualified, "[t]he question we must ask is not whether an expert witness is qualified in general, but whether his qualifications provide

a foundation for him to answer a specific question." *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (internal alterations and quotation marks omitted). A court is to "consider a proposed expert's full range of practical experience as well as academic or technical training." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). However, "[t]he district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013). In that vein, "'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton*, 593 F.3d at 616 (citing *Daubert*, 509 U.S. at 596).

Campion concedes he is not a professional statistician, and it is fairly clear that the nature of his report is statistical. For example, Campion makes judgments about the statistics value of defendant's expert's study. *See* Def.'s Ex. D (Expert Report of Michael A. Campion, Ph.D.) at 7 ("There are less than a handful of White employees in the Communications Technician jobs in any given year at 112th Street. This means there is inadequate statistical power to detect a race difference."); *id.* at 12 ("Breaking down the promotion analyses into each unique type of promotion reduces the sample sizes to the point where they have limited ability to detect race differences (i.e., they have low statistical power)."). The report also contains regression analyses and various other statistical computations. The Court must determine if Campion is qualified to answer the specific questions he poses, *Gayton*, 593 F.3d at 616, which include assessments of the correctness of Comcast's expert's statistical report, as well as Campion's own statistical analyses.

Comcast's attack on Campion's qualifications largely concerns his educational background, teaching history, and prior experience testifying on statistics. However, these are not the only factors to be considered in evaluating an expert's qualifications. As noted above, the Court must consider Campion's "full range of practical experience." *Smith*, 215 F.3d at 718. In fact, "Rule 702 of the Federal Rules of Evidence specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Summers v. State St. Bank & Trust Co.*, 453 F.3d 404, 412 (7th Cir. 2006) (internal alterations and quotation marks omitted).

Although Campion is not a statistician—he is a professor of management—he has a sufficient background in statistics to testify on the subjects covered in his report. As Campion's report notes, he has written or co-authored many articles in scientific and professional journals, and "[t]he majority of the articles and presentations include statistical analyses." Def.'s Ex. D at 3. A perusal of these articles, which are listed on Campion's academic resume (an exhibit Comcast itself provided, *see* Def.'s Ex. C at 8– 33), reveals ample evidence of Campion's experience in the field of statistics, including regression analyses. *See, e.g.*, Julia Levashina et al., *The Structures Employment Interview: Narrative and Quantitative Review of the Research Literature*, 67 Personnel Psych. 241 (2014); Julia Levashina & Michael A. Campion, *Measuring Faking in the Employment Interview: Development and Validation of an Interview Faking Behavior Scale*, 92 J. Applied Psych. 1638 (2007); Frederick P. Moregeson et al., *Self-Presentation Processes in Job Analysis: A Field Experiment Investigating Inflation in Abilities, Tasks, and Competencies*, 89 J. Applied Psych. 674 (2004). Although Campion was not the lead author on some of these articles, he was nonetheless an

author, demonstrating his frequent participation in academic work incorporating statistical analysis.

Comcast says Campion has "never published on statistics," Def.'s Mot. at 10, but as the above-cited articles and others on his resume show, Campion has certainly employed statistics in academic work concerning employment. Given his background and experience, Campion need not have written articles opining on the subject of statistics to qualify as an expert qualified to perform statistical analysis. Comcast also selectively quotes from Campion's deposition; although Campion did answer "it depends" when asked whether he is a statistician, he also noted correctly that statistics is "one of the core competencies of people in my field," a statement borne out by his published academic work. Def.'s Ex. F at 23–24. The Court concludes that Campion is qualified to perform statistical analysis and draw conclusions from it about plaintiffs' allegations in this case.

### b. Methodology

Rule 702 requires an expert's report to be based upon "reliable principles and methods." Fed. R. Evid. 702(c); *Lees v. Carthage Coll.*, 714 F.3d 516, 521 (7th Cir. 2013). Although district courts are limited to scrutinizing "the reliability of the methodology the expert employed" rather than "the quality of the expert's data and conclusions . . .[,] this is not always an easy line to draw." *Manpower, Inc.*, 732 F.3d at 806. In all cases, "[t]he critical inquiry is whether there is a connection between the data employed and the opinion offered." *Id.*

Comcast argues that Campion did not evaluate plaintiffs' inferior equipment theory, nor did he perform a detailed investigation into the facts of this case or read

corporate deposition testimony about promotions and compensations.  But neither of these contentions goes to Campion's methodology in executing the analysis in his report, which is what the Court appropriately considers.  Nor do Comcast's contentions show there is no "connection between the data [Campion] employed" and the opinion he offered.  *Id.*  Comcast's arguments do not, for example, question Campion's computational methods or the theory behind them.  Rather, these arguments go to the weight of Campion's report, which is properly a matter for the jury's consideration.  It is reserved to the trier of fact "to evaluate the soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis."  *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1068 (7th Cir. 2013) (internal quotation marks omitted).  If a jury in this case ultimately concludes that Campion's report is not entitled to weight because, as Comcast argues, he "skimmed" plaintiffs' complaint, or because his report does not touch on plaintiffs' inferior equipment theory—which, it must be said, is not plaintiffs' only discrimination-related argument—then it is entitled to do so.  But weighing the persuasiveness of an expert's report is not an appropriate undertaking for a court considering whether to allow the expert to testify.

Another of Comcast's arguments against Campion's report does, however, touch on his methodology.  Comcast points out that one of Campion's analyses employs a "four-fifths" or "80%" test to evaluate intentional discrimination in promotions.  *See* Def.'s Ex. D at 21 (discussing use of "Adverse Impact Ratio," which views "[v]alues below .80" in measuring differences in passing rates between groups as "preliminary evidence of meaningful differences").  Comcast argues that this test "is not the

methodology for evaluating intentional discrimination allegations."  Def.'s Mem. at 14.
(The four-fifths standard was established by the Equal Employment Opportunity
Commission and "has not provided more than a rule of thumb for the courts."  *Watson v.
Fort Worth Bank & Trust*, 487 U.S. 977, 995 n.3 (1988) (plurality opinion).)

 Plaintiffs consistently present their claims as disparate treatment claims, not
disparate impact claims.  *See, e.g.*, Pls.' Mem. at 7 ("Comcast's disparate treatment of
African Americans at 112th Street Contributed to the hostile work environment."); *id.* at
40 (putative class members "have suffered disparate treatment" due to a number of
conditions); *id.* at 43 (it is a common question among terms and conditions class
members "whether the working conditions at the 112th facility amount to disparate
treatment of African Americans").  The two types of claims present different concerns.
*See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977).  Plaintiffs
appear to concede that Campion used the 80% test.  They argue, however, that it "is a
useful 'benchmark' from which to conduct further analyses, which is exactly what Dr.
Campion did."  Pls.' Resp. at 9.

 As with Comcast's other arguments about Campion's methods, its contention
about his use of the 80% test does not touch upon whether that test is "scientifically
reliable."  *See Bielskis*, 663 F.3d at 893.  Rather, Comcast is arguing that the test is not
pertinent to a disparate-impact claim; it does not contend that the test itself is flawed or
that the data Campion used in employing it were questionable.  Plaintiffs are entitled to
argue, as they do here, that despite the test's more typical use in a disparate-impact
case, it may be used as a "benchmark" assisting in analysis of their disparate treatment
claims.  Whether that benchmark is of any assistance to the trier of fact is for the trier of

fact to decide.  The Court notes, however, that its decision not to exclude Campion's testimony because of his use of this test does not alter the outcome of its decision on the motion for class certification.  As discussed below, the Court declines to certify plaintiffs' proposed promotions subclass for failure to meet the requirements of Federal Rule of Civil Procedure 23(a)(2), in part because such statistical analyses do not aid plaintiffs in establishing a common question of the reasons for the various promotion decisions that affected them.

### c.    Assistance to trier of fact

Rule 702 also requires that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  This requires in part "that expert testimony be relevant, reliable, and have a factual basis."  *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 809 (7th Cir. 2012).

Comcast contends that Campion "*does not offer any opinion on*" the issue of whether "Comcast has subjected African-American employees *at 112th Street* to unequal working conditions and employment opportunities because of their race and the race of the customers they service."  Def.'s Mem. at 12.  Rather, Comcast argues, Campion "addresses how African-American employees fare against white employees throughout the GCR [Greater Chicago Region]," which "is of no moment" because plaintiffs do not make allegations about facilities other than 112th Street.  *Id.*  In other words, Comcast contends Campion's report is not relevant.  Comcast essentially overlooks, however, that Campion has indeed made an analysis specific to African-American 112th Street employees.  He writes in his report that "[s]everal comparisons were conducted" for the report, "including . . . Blacks at 112th Street compared to

Whites in the Suburbs.  This analysis focuses only on the Blacks at the location where the lawsuit was filed and compares them to Whites who are at locations outside of the City."  Def.'s Ex. D at 18.  Tables 1, 2, 3, and 4 of the report contain the data on this comparison.  *See id.* at 26–30.  Comcast is therefore incorrect that Campion has offered no opinion on the disparities between African-American Comcast employees at the 112th Street facility and employees at other locations.

Comcast is correct, however, that part of Campion's analysis focuses on comparisons between all white and all African-American employees of Comcast in the Chicago area as a whole and is not limited to African-American employees at the 112th Street facility.  *See id.* at 18 (listing "[a]ll Blacks versus all Whites in all locations" and "[a]ll City Blacks compared to Whites in the Suburbs" among Campion's points of analysis); *id.* at 26–30 (tables containing data on these comparisons).  Comcast accurately points out that plaintiffs are asserting claims only for Comcast's 112th Street African-American employees, not for any other employee of Comcast.  Although Campion's calculations in these other categories may be relevant at a later stage of the case, they are not relevant to the question of whether a class of 112th Street Comcast employees should be certified.  Therefore, the Court declines to consider these larger comparisons for class certification purposes.

Comcast also argues that the Court should strike Campion's report because he did not offer definitive conclusions on causation.  Although this fact, if correct, might limit the persuasive value of the report—as Comcast frames it, the lack of causation analysis could be "unhelpful," Def.'s Mem. at 12—the Court does not agree that a lack of causation analysis renders the report entirely irrelevant and warrants striking the report

in full.

### 2.    Blank (witness for plaintiffs)

Plaintiffs have also submitted the report of Eric Blank, an information security attorney.  Blank's report states that his work in the case "has included the examination, processing, and extraction of data from a 15 Gigabyte text file," which was "in database-type format."  Pls.' Ex. 9 at 4–5.  In the report, Blank describes how he identified errors in the records within the file and ran searches on the data to create a database, excerpts of which are attached to the report.  Blank adds that he searched the database for the specific terms "new" and "used," "by location."  *Id.* at 6.  At no point, however, does Blank describe what the data represent, the results of his search, or what his opinion about the results might be.  The attachments to the report include a list of locations—presumably Comcast facilities, although, again, the report does not confirm this—with percentages and amounts for each facility listed under columns for "New" and "Used."  *See, e.g.*, *id.* Ex. D, Workbook 1.

Comcast contends that Blank is not qualified as an expert in statistical analysis of data; the report contains faulty data; and Blank does not actually provide any analysis or conclusions, which it contends makes his report irrelevant and inadmissible under Rule 702.  "The Blank Report should not be treated as an expert report," Comcast argues, "because it does not 'go beyond' the data it purports to summarize."  Def.'s Mem. at 6. In response, plaintiffs contend that "Blank did not 'merely summarize' data," because he had to create a database containing the evidence and run queries on it, the results of which show 112th Street employees installed more used equipment than other Comcast Chicago employees.  Pls.' Resp. at 6.

The Court concludes that Blank need not be qualified as an expert. In his report, Blank does not "testify in the form of an opinion or otherwise" in that he does not "appl[y]" his expert knowledge "to the facts of the case." Fed. R. Evid. 702(d). Instead, Blank's report discusses how he formatted and searched the data, and it attaches small portions of his spreadsheets without any analysis of what lies within.

This does not mean, however, that the Court should strike the report. It is properly admitted as "a summary, chart, or calculation to prove the content of voluminous writings . . . that cannot be conveniently examined in court" under Federal Rule of Evidence 1006. Blank's report indicates that he formatted voluminous data into charts, excerpts of which are attached as exhibits to the report; the result is clearly a summary, chart, and calculation of evidence that cannot feasibly be examined in court. Under the rule, the proponent of the summary must make the evidence available to other parties. Here, as plaintiffs point out, the data itself came from Comcast, so Comcast presumably has already seen "the originals or duplicates" as required under Rule 1006. In addition, "[b]ecause a Rule 1006 exhibit is supposed to substitute for the voluminous documents themselves . . ., the exhibit must accurately summarize those documents." *United States v. White*, 737 F.3d 1121, 1135 (7th Cir. 2013). Comcast does not contend that the summary itself is inaccurate—it does not make any arguments about the state of the underlying data that Comcast provided to plaintiffs, to the extent that Blank neglected to use portions of it. Rather, it argues that there is duplicate, incomplete, and partial data underlying the summary. Again, as plaintiffs observe, Comcast provided the data in question, and plaintiffs say "Blank decided to analyze the data *as produced*—rather than try to cherry pick data for 'corrections.'" Pls.'

14

Resp. at 8.  There is therefore little reason to think from Comcast's arguments that the summary itself is inaccurate.

The Court concludes that Blank's report is properly admitted as a summary under Rule 1006.

### 3.  Kelly (witness for defendant)

Comcast has submitted the declaration of Patricia Kelly, the director of learning and development for Comcast University in the Chicago region.  Kelly states in her declaration that various employees, including several of the named plaintiffs, enrolled in various types of training that Comcast provided.  She includes a chart listing Comcast's Chicago facilities, with number of employees per location and average hours of training per employee at each location.  Plaintiffs have moved to strike Kelly's declaration, arguing that it is an improper summary, chart, or calculation under Rule 1006.  They contend that Kelly has not shown that the summary and underlying data are accurate, in particular that her calculation contains duplicate entries; she did not make all the underlying data available to plaintiffs; her concluding chart is misleading because it includes the training hours of managers, supervisors, and payment center employees; and she did not lay a foundation for the report because she does not say what type of underlying data she used.  In response, Comcast argues that Kelly's declaration is not a Rule 1006 summary.  It also contends that data about training hours by managers and supervisors are relevant because plaintiffs seek to represent a class of all African-American workers at 112th Street, not just technicians.  Further, Comcast says that even if Kelly's declaration is a Rule 1006 summary, she provided a sufficient foundation for it in identifying the data she used, which Comcast produced to plaintiffs, and that

errors in the underlying data do not affect admissibility of the summary itself.

The Court concludes that Kelly's declaration is properly admissible as a Rule 1006 summary. First, it is clearly a summary, chart, and calculation. Indeed, in her declaration, Kelly performs calculations of the number of hours for each employee, summarizes the results, and then presents the results in a chart. *See* Def.'s Ex. 3 (Decl. of Patricia Kelly) at 2–3. Further, the data involve what appear to be thousands of training hours for hundreds of employees, fitting the description of information "that cannot be conveniently examined in court." Fed. R. Evid. 1006. If the declaration by Kelly containing these elements is not a Rule 1006 summary, the Court is not sure what would qualify under the Rule.

Plaintiffs' primary argument regarding the accuracy of Kelly's report is that a document labeled COMCAST_BRAND00049791, which Kelly used to form the conclusions in her declaration, "includes duplicate entries, entries with employees identified as working at the wrong facility, and entries for training that was never attended and/or completed." Pls.' Mem. at 3. Again, Rule 1006 permits a party to "use a summary, chart, or calculation" to prove the content of data "that cannot be conveniently examined in court." The rule does not require the party offering the summary to demonstrate, as part of the foundation for admissibility, that the underlying data is accurate, nor does case law interpreting the rule do so. In fact, the summary "must not misrepresent" the contents of the underlying evidence. *White*, 737 F.3d at 1135. Juries, not judges, decide whether evidence is accurate. *See United States v. Abel*, 469 U.S. 45, 52 (1984) ("[T]he jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and

truth of a witness' testimony."). Plaintiffs may challenge the accuracy or completeness of the underlying data in Kelly's report through other evidence and cross-examination.

In arguing that Kelly did not lay a foundation for her conclusions, plaintiffs contend that Kelly "failed to explain the type of underlying data she used." Pls.' Mem. at 5. The Court disagrees. Kelly plainly identifies the document from which she drew her data—the same COMCAST_BRAND00049791 document mentioned earlier. Plaintiffs' argument that Kelly's declaration violates Rule 1006 because Comcast did not provide to plaintiffs all data she used is similarly lacking. As Comcast explains, although Kelly produced the dataset in February 2013, it contains information about training courses for Comcast employees through May 2013—and this is the same dataset that Comcast produced to plaintiffs. It is apparent that the document includes information on future training. Further, Comcast is correct that plaintiffs seek to certify a class of all Comcast employees at 112th Street, not just technicians, so Kelly's data relates to plaintiffs' motion for class certification. Regardless, arguments that Kelly's dataset contains more information than is relevant go to the weight of her conclusions in her declaration, not whether it is admissible.

The Court concludes that Kelly's declaration is properly admissible under Rule 1006.

### 4.    Siskin (witness for defendant)

Comcast has submitted in evidence the expert report of Bernard Siskin, the director of an economics consulting firm who is the former chairman of the department of statistics at Temple University and author of publications on statistical methodology. Siskin makes several conclusions in his report, such as that there is no statistical

evidence of a pattern of African-American employees at the 112th Street facility being paid less than other employees there, or at Comcast's North Avenue facility in Chicago. He also concludes that the named plaintiffs' pay data are not typical of other 112th Street employees and that no statistical evidence indicates that 112th Street employees are less likely than other Chicago Comcast employees to be promoted. Comcast has also submitted a rebuttal report by Siskin criticizing Blank's report submitted on behalf of plaintiffs.

Plaintiffs do not challenge Siskin's qualifications as an expert. They do, however, make other arguments against the Court's consideration of his report, which the Court addresses in making the required examination of Siskin's methodology and the assistance his testimony provides to the trier of fact. See *Bielskis*, 663 F.3d at 893.

## a.  Methodology

Plaintiffs contend that Siskin's regressions contain computational errors and miscalculations; they exclude over half the promotions at issue; data he used from Comcast's North Avenue facility is fifty percent incomplete; his conclusion on technician's "rework rates" is based on unreliable comparisons; he relies on faulty assumptions when comparing Comcast's city to suburban facilities; and his report fails to consider race.

As noted above, however, the Court is tasked only with assessing whether Siskin's report and testimony "is the product of reliable principles and methods." Fed. R. Evid. 702. Courts may consider several factors under *Daubert* when assessing an expert's methodology, including "(1) whether the theory has been or is capable of being tested; (2) whether the theory has been subjected to peer review and publication; (3)

18

the theory's known or potential rate of error; and (4) the theory's level of acceptance

within the relevant community."  *Bielskis*, 663 F.3d at 893.

Although this list is "non-exhaustive," *id.*, none of plaintiffs' arguments concerning

various alleged errors in Siskin's report touch on these factors.  In fact, they do not

concern his methods or "theories" at all.  "The question of whether the expert is credible

or whether his or her theories are correct given the circumstances of a particular case is

a factual one that is left for the jury to determine after opposing counsel has been

provided the opportunity to cross-examine the expert regarding his conclusions and the

facts on which they are based."  *Smith*, 215 F.3d at 719.  Plaintiffs' criticisms of Siskin's

report concern his data, comparisons, and assumptions, such as that his regressions

"fail to include race as a variable," that his assumption of a "city effect" in the data "is

unsupported, untested and therefore unreliable," and that his study contains "just

obvious math errors."  Pls.' Mem. at 6, 8, 15.  These are all proper subjects for cross-

examination and presentation of opposing evidence to the trier of fact, not a basis for

exclusion of Siskin's testimony.  The Court declines to strike Siskin's report or testimony

based on these arguments.

### b.    Assistance to trier of fact

In addition, plaintiffs argue that Siskin's reports are inadmissible as hearsay and

unreliable because he did not create the reports or supervise or control them.  Instead,

plaintiffs contend, a firm called Navigant Economics processed, verified, and analyzed

the data and then wrote the reports.  They point to various entries in the work logs by

both Navigant and Siskin on the reports, observing, for example, that a Navigant

employee reported reviewing a draft report on May 1, prior to which Siskin's only work

on the project had been to review materials and meet with Comcast. Plaintiffs observe that Siskin spent 44.75 hours on the reports, a smaller amount than Navigant's 1018 hours, and they conclude that Siskin was "merely the mouthpiece . . .as opposed to the actual expert" behind the report. Pls.' Mot. to Bar Siskin at 6. Plaintiffs also base this conclusion on Siskin's contract with Navigant, which says that Siskin will provide expert testimony and nothing more, and they argue that Siskin does not claim to have written the reports.

A party must disclose an expert witness and provide "a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case." Fed. R. Civ. P. 26(a)(2). This rule does not suggest that an expert cannot appropriately rely upon others to help, and it would be unrealistic to conclude otherwise. The Seventh Circuit has said there is "nothing remarkable about a paid expert preparing a report with the assistance of staff." *Manpower, Inc.*, 732 F.3d at 810. Plaintiffs acknowledge that Siskin's time log includes twenty-five hours spent on reviewing materials and report writing before the first report. This undercuts plaintiffs' contention that Siskin does not claim to have written the reports. Also, without any citation to any document in evidence or deposition, plaintiffs say that Siskin "failed to independently verify the accuracy of" the data, calculations, and assumptions in the report. Pl.'s Mot. to Bar Siskin at 4. They offer little argument beyond pointing to a tally of hours, which is not enough in this case to call into question whether Siskin actually performed or verified the relevant work.

Furthermore, the cases plaintiffs cite are distinguishable from this one. One holds that "[a] scientist, however well credentialed he may be, is not permitted to be the

mouthpiece of a scientist in a different specialty." *Dura Auto. Sys. Of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002). Plaintiffs do not argue here that Navigant's personnel are experts from some other field whose opinions Comcast sought to channel through an economist. In another of plaintiffs' cases, an expert and a non-expert attempted a "hand-off" wherein an architect expert attempted to vouch for the truth of what an engineer told him—another situation unlike this case. *See In re James Wilson Assocs.*, 965 F.2d 160, 172–73 (7th Cir. 1992). In a third case, the party's expert had "absolutely no knowledge of whether the theory" about which he was testifying was "valid and reliable." *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 809 (N.D. Ill. 2005). Plaintiffs cannot seriously contend that Siskin similarly has zero knowledge about the "theory" he presents in his report, given his background and the time he spent reviewing Navigant's analysis. Rather than Siskin acting as a "mouthpiece" for Navigant, it is apparent from the record that Navigant assisted Siskin.

Given these conclusions, and the lack of persuasive argument against Siskin's methodology or the assistance of his expertise to the trier of fact, the Court determines that Siskin's report and testimony are admissible under Rule 702.

### c. Rebuttal report

Finally, plaintiffs contend that the Court should strike Siskin's report in rebuttal to Blank's report because "Siskin did not restrict his analysis to refuting the opinions" of Blank. Pls.' Mem. at 16. Specifically, plaintiffs contend, Siskin's rebuttal report impermissibly offers opinions about why locations outside of the 112th Street facility install more new equipment. Plaintiffs do not explain why this is not appropriate rebuttal. It is true that the Court has determined that Blank's submission is a summary

admissible under Rule 1006 rather than an expert report as such.  It was, however, submitted as an expert report—the words are there on the first page of Blank's report—and Comcast was thus permitted an appropriate rebuttal under Federal Rule of Civil Procedure 26(a)(2)(D)(ii).  Proper use of rebuttal evidence in general "include[s] the contradiction, impeachment, or defusion of the impact of the evidence offered by an adverse party." *United States v. Bell*, 624 F.3d 803, 810 (7th Cir. 2010).  In his rebuttal report, Siskin, appropriately discussed the information contained in Blank's report and provided his own analysis, which falls under the heading of "defusion."  The rebuttal report was proper under Rule 26(a)(2)(D)(ii).

Plaintiffs further question the rebuttal report because the likelihood that its analysis of equipment usage at Comcast's facilities is correct—an analysis that involves millions of individual pieces of equipment—"truly defies any reasonable expectations." Pls.' Mem. at 17.  This argument is not otherwise explained.  At most it addresses the weight that the trier of fact should assign to Siskin's rebuttal report.  It is not a basis to conclude that the rebuttal report is inadmissible.

**B.    Motion to certify class**

The Court turns next to plaintiffs' motion for class certification.  A party seeking class certification bears the burden to "affirmatively demonstrate his compliance" with the requirements of Federal Rule of Civil Procedure 23.  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  The putative plaintiffs must first satisfy the four prerequisites of Rule 23(a):  the class is so numerous that joinder of all of the class members is impracticable (numerosity); there are questions of law or fact common to the proposed class (commonality); the class representative's claims are typical of the

claims of the class (typicality); and the representative will fairly and adequately represent the interests of the class (adequacy of representation).  Fed. R. Civ. P. 23(a)(1)-(4).  Second, the proposed class must fall within one of the three categories in Rule 23(b), which are: "(1) a mandatory class action (either because of the risk of incompatible standards for the party opposing the class or because of the risk that the class adjudication would, as a practical matter, either dispose of the claims of nonparties or substantially impair their interests), (2) an action seeking final injunctive or declaratory relief, or (3) a case in which the common questions predominate and class treatment is superior."  *Spano v. Boeing Co.*, 633 F.3d 574, 583 (7th Cir. 2011); Fed. R. Civ. P. 23(b)(1)-(3).

Plaintiffs have moved to certify a class under both Rule 23(b)(2) and (b)(3) consisting of "[a]ll current and former African American employees at the 112th Street facility during the period January 1, 2005 and the present."  Pls.' Class Cert. Mot. ¶ 4. They refer to this as the "hostile work environment class."  Pls.' Class Cert. Mem. at 37. Plaintiffs also request certification of an "overall terms and conditions class," *id.*, defined as "[a]ll current and former African American employees employed between November 2007 and the present by Comcast at the 112th Street facility."  Pls.' Class Cert. Mot. ¶ 6. In addition, in their motion and memoranda, plaintiffs propose three subclasses "based on the discriminatory terms and conditions at Comcast's 112th Street facility."  Pls.' Class Cert. Mot.¶ 7.  These proposed subclasses consist of (1) "[a]ll current and former technicians at the CT2 or higher level who were denied or delayed promotions"; (2) "[a]ll current and former cable technicians at the CT2 or higher level who were denied equal and appropriate pay rates"; and (3) "[a]ll current and former cable technicians who were

subjected to discriminatory discipline or terminations." *Id.* ¶¶ 7(a)–(c). Finally, should the Court decline to certify either plaintiffs' hostile work environment class or its alternative overall terms and conditions class, plaintiffs seek certification of "'issues classes' under Rule 23(c)(4) that are limited to the liability issues associated with their claims." *Id.* ¶ 10.

From plaintiffs' class certification motion and their supporting memoranda, it was unclear to the Court whether plaintiffs' proposed subclasses were intended to supplement the terms and conditions class only or were also offered as potential subclasses to the hostile work environment class. To obtain an answer to this and other questions, the Court held a brief hearing with both parties in early June 2014. At the hearing, plaintiffs' counsel stated that the subclasses were intended to supplement either or both of plaintiffs' proposed classes. The Court then asked how the subclasses could supplement the hostile work environment class when the subclasses appear to encompass discrimination claims about disparate pay, promotions, and discipline, which are typically presented separately from hostile work environment claims. Plaintiffs conceded the subclasses did not fit well as subclasses of the hostile work environment class. At the conclusion of the hearing, although it was not entirely clear, plaintiffs appeared to state that they were asking for certification of each of the classes separately, without categorizing the pay, promotions, and discipline and terminations classes as subclasses. The Court will therefore analyze each of plaintiffs' proposed classes as a standalone class.[1]

---

[1] The Court also commented at the hearing that it appeared that proposed class one, the hostile work environment class, was actually narrower in terms of subject matter than proposed class two, which as an "overall terms and conditions" class includes

### 1. Hostile work environment class

Plaintiffs allege that there was a hostile working environment at Comcast's 112th

Street facility based on

> (1) racial slurs and insults directed to and about 112th Street employees;
> (2) the dilapidated, infested and unsafe working conditions imposed upon
> the 112th employees; (3) Comcast's policy of distributing broken, infested,
> defective, inferior and used tools and equipment to African Americans at
> the 112th Street facility; and (4) Comcast's refusal to remedy or prevent
> the racially offensive conduct

Pls.' Mem. at 37. Comcast focuses much of its argument on whether "there are

questions of law or fact common to" the hostile work environment class under Rule

23(a)(2). It also argues the representative plaintiffs cannot show their claims are typical

of the class under Rule 23(a)(3). Finally, Comcast argues that plaintiffs cannot satisfy

either the requirements of Rule 23(b)(2) or the predominance and superiority

requirements of Rule 23(b)(3).

### a. Numerosity

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members

is impracticable." Courts have found that a class of forty is, or at least can be,

sufficiently large to satisfy Rule 23(a)(1). *See Pruitt v. City of Chicago*, 472 F.3d 925,

926–27 (7th Cir. 2006) ; *Costello v. BeavEx Inc.*, No. 12 C 7843, 2014 WL 1289612, at

*8 (N.D. Ill. Mar. 31, 2014). Plaintiffs contend their proposed hostile work environment

class is sufficiently numerous for purposes of Rule 23(a)(1), as it contains at least 350

---

hostile work environment claims and more. The Court questioned why a broader class
would be proposed as an alternative or fallback to a narrower class. The response by
plaintiffs' counsel indicated that the different time periods covered by the two classes—a
larger time period for proposed class one than proposed class two—meant that more
members would be included in class one. In short, plaintiffs appear to have proposed
the hostile work environment class as their first choice because though its subject
matter is narrower, it includes more members than proposed class two.

people who have worked at the 112th Street facility since January 1, 2005.  Comcast

does not challenge this argument, and considering the proposed class's size, the Court

concludes that it satisfies Rule 23(a)(1).

### b.  Commonality

Defendants contend that plaintiffs have failed to show that there are questions of

law or fact common to the class as required by Rule 23(a)(2).  Relying on the Supreme

Court's decision in *Wal–Mart*, the Seventh Circuit has explained that in order to show

commonality, a plaintiff must demonstrate that the class members all "suffered the same

injury."  *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 497 (7th Cir. 2012) (citing *Wal–*

*Mart*, 131 S. Ct. at 2551); *Bolden v. Walsh Const. Co.*, 688 F.3d 893, 896 (7th Cir.

2012).  "[S]uperficial common questions—like whether . . . each class member suffered

a violation of the same provision of law—are not enough."  *Id.* (internal quotation marks

omitted).  Rather, class claims "must depend on a common contention that is capable of

classwide resolution—for example, the assertion of discriminatory bias on the part of the

same supervisor."  *Wal-Mart*, 131 S. Ct. at 2551.  Even if there is such a common

contention, that is not enough to establish commonality; a plaintiff must show that

"determination of its truth or falsity will resolve an issue that is central to the validity of

each one of the claims in one stroke."  *Id.*  And specifically, "in resolving an individual's

Title VII claim, the crux of the inquiry is the reason for a particular employment

decision."  *Id.* at 2552.  The Supreme Court continued:  "Without some glue holding the

alleged *reasons* for all those decisions together, it will be impossible to say that

examination of all the class members' claims for relief will produce a common answer to

the crucial question *why was I disfavored*."  *Id.*

26

The Supreme Court in *Wal-Mart* drew upon its earlier decision in *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982), to discuss the way "the commonality issue must be approached" on the part of plaintiffs bringing class claims of employment discrimination. *Wal-Mart*, 131 S. Ct. at 2552–53. As in *Falcon*, plaintiffs might show either existence of an employer's biased testing procedure, or "significant proof that an employer operated under a general policy of discrimination . . . if the discrimination manifested itself in hiring and promotion practices in the same general fashion." *Id.* at 2553. Such "an illegal *policy* might provide the 'glue' necessary to litigate otherwise highly individualized claims as a class." *Jamie S.*, 668 F.3d at 498.

As noted above, both the Supreme Court in *Wal-Mart* and the Seventh Circuit in subsequent cases have required a showing "that the class members have suffered the same injury" in order for commonality to be present. *Bolden*, 688 F.3d at 896 (internal quotation marks omitted). A hostile work environment may be experienced differently from one person to the next, but it is nonetheless "a single unlawful practice under Title VII." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009). The multi-factor test for hostile work environment requires a showing "(1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014) (internal quotation marks omitted). These elements, when satisfied, combine to show a workplace that "is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). A court examining such a claim must "look to all the circumstances" in a particular workplace, because the claim "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116-17 (2002).

The Seventh Circuit has been fairly consistent in concluding that the severe or pervasive use of racial epithets can on its own create an objectively hostile work environment. *See Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." (internal quotation marks and citation omitted)). *See also, e.g.*, *Passananti v. Cook Cnty.*, 689 F.3d 655, 668 (7th Cir. 2012) ("In claims of racial harassment, racially-charged words certainly can suffice."); *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004) ("[W]e recognize that the word 'nigger' can have a highly disturbing impact on the listener. . . . [A] plaintiff's repeated subjection to hearing that word could lead a reasonable factfinder to conclude that a working environment was objectively hostile."); *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002) ("While there is no 'magic number' of slurs that indicate a hostile work environment, we have recognized before that an unambiguously racial epithet falls on the 'more severe' end of the spectrum."). Furthermore, the offensive phrases need not have been spoken directly to plaintiffs to create an objectively hostile work environment; if use of the terms is "[r]epeated," then they may be actionable "even if they are heard secondhand." *Dandy v. United Parcel*

*Serv., Inc.*, 388 F.3d 263, 272 (7th Cir. 2004).

In this case, plaintiffs allege repeated utterances of the word "nigger" as well as several other terms that are racist either in and of themselves or in context: "boy," "lazy," "ghetto," "thug," "illiterate," "dumb," "you people." *See* Pls.' Mem. at 6. For its part, Comcast argues it "is pure distortion" for plaintiffs to contend that racial slurs were frequently uttered at the 112th Street facility, in part because some named plaintiffs did not recall hearing "nigger" when testifying in their depositions and because just six of thirty-three putative class member declarants declared that they had heard the term. Def.'s Resp. at 16. Comcast seeks to highlight what it characterizes as anecdotal or infrequent use of the term by outlining the individual incidents where plaintiffs and putative plaintiffs heard it uttered, and it proceeds to argue that the other epithets plaintiffs highlight "have no explicit racial connotation, and were not directed exclusively and African-American employees." *Id.* at 19.

From a review of their depositions in this case, it appears that six of the twelve named plaintiffs reported hearing the word "nigger" from a Comcast supervisor at 112th Street, and eleven of the twelve heard at least one phrase that plaintiffs contend was racist or racially hostile. The plaintiffs and the putative class declarants together number forty-four individuals. Eleven of the forty-four heard the word "nigger" uttered, and thirty-five out of forty-four (or eighty percent) reported hearing at least one of the terms plaintiffs contend were racially hostile. As plaintiffs describe various experiences in hearing these terms, they allege that managers often used them when speaking to groups of employees in the open and that use of these words was not isolated. *See, e.g.*, Dep. of Shannon Jordan at 53 (supervisor "was walking through the hall and he

literally said 'some of you niggers don't need a raise.' . . . [H]e used them words a whole lot."); Dep. of Marvin Cooper at 128 (deponent overheard manager call another employee "nigger" over two-way radio); Dep. of James Brand at 155 (describing supervisor's reference to African-American employees as "boy" "over the phone or two-way radios" on "a number of occasions"); Dep. of Timothy Wharton at 46 (noting that "several supervisors" referred to 112th street technicians as "'lazy techs' and 'ghetto techs'"); Dep. of Cyrus Robinson at 41 (supervisor called technicians "boy" and "you people" in meetings).

As discussed, Comcast contends that use of these terms was infrequent and largely racially neutral. The Seventh Circuit has, however, stated on multiple occasions that language need not be both severe and pervasive in order to constitute a hostile work environment. *See Hall v. City of Chicago*, 713 F.3d 325, 330 (7th Cir. 2013) (noting that "severe or pervasive" requirement for hostile work environment "is disjunctive—one extremely serious act of harassment could rise to an actionable level as could a series of less severe acts" (internal quotation marks omitted)). As already discussed, use of a clearly racial term such as "nigger" constitutes severe racial harassment. *See Cerros*, 288 F.3d at 1047 ("[A]n unambiguously racial epithet falls on the 'more severe' end of the spectrum.").

Given the number of named plaintiffs and putative class members who heard the use of the word "nigger," along with the vast majority who heard other terms claimed to have been racially offensive, plaintiffs have provided evidence sufficient to establish "significant proof" of the common question of whether a hostile work environment existed for African-American employees of Comcast's 112th Street facility. *See Wal-*

*Mart*, 131 S. Ct. at 2553. The high percentage of plaintiffs and putative plaintiffs for this case who heard epithets that they considered to be and that a reasonable person could find to be racially motivated constitutes a common claimed injury that appears to have been, sufficiently for class certification purposes, both severe and pervasive. All in all, plaintiffs have sufficiently alleged that there is a common question among 112th Street workers about whether they heard racially offensive terms during the course of their employment to the extent that they constituted a hostile work environment.

One further note on the issue of racial slurs. Comcast states or appears to state at several points in its memorandum that the term "nigger" was uttered by African-American supervisors to African-American employees—suggesting that this renders the term non-racist, or that it is inconceivable that African-American supervisors could participate in creating a work environment hostile to lower-level African-American employees. Whatever Comcast's understanding of the term might be, the Supreme Court and Seventh Circuit have rejected the notion that membership in the same race as one's employees renders the employer immune from claims of racial discrimination: "[I]n the related context of racial discrimination in the workplace we have rejected any conclusive presumption that an employer will not discriminate against members of his own race." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (internal quotation marks omitted); *see also Castaneda v. Partida*, 430 U.S. 482, 499 (1977) ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group."). Further, as discussed above, the Seventh Circuit has been unequivocal in stating that the term on its own is objectively racially hostile. *See*

31

*Rodgers*, 12 F.3d at 675. In short, even were it appropriate to adjudicate the merits of plaintiffs' claims at this point in the litigation, Comcast has not supported the proposition that pervasive use of the term "nigger" by African-American supervisors in referring to lower-level workers cannot, as a matter of law, cause or contribute to an actionable hostile work environment.

Plaintiffs' hostile work environment claim is not limited to the use of racist and racially demeaning language. They also contend that the infested, used, and defective equipment issued to 112th Street employees and the infested and dilapidated condition of the facility itself were components of a racially hostile work environment, and that Comcast's managers and supervisors were indifferent to employees' complaints about racial discrimination. Comcast argues that it renovated the 112th Street facility, which it contends alleviated if not solved workers' concerns about the building and their equipment, eliminating "the 'glue' that binds Plaintiffs' proposed class" for commonality purposes. Def.'s Resp. at 40. It also contends that Comcast managers and supervisors did listen to and address worker complaints and thus that there is no "systemic policy" of disregarding worker complaints that would present a common question among plaintiffs. *Id.* at 20.

The Court agrees with plaintiffs that these additional allegations contribute to the common question of whether there was a hostile work environment at the 112th Street facility. As noted earlier, "hostile working conditions at a single place of employment are a single unlawful practice." *Bright v. Hill's Pet Nutrition, Inc.*, 510 F.3d 766, 768 (7th Cir. 2007). First, by its nature, the issue of the condition of the 112th Street facility presents a concern common to any employee working there. In this case, all of the named

32

plaintiffs and most of the putative class declarants have said that the facility was infested with vermin or in disrepair. Comcast's arguments that it received the building in poor condition when it took over the lease and that plaintiffs "exaggerate[ ]" pest issues, Def.'s Resp. at 7, while perhaps a viable defense on the merits, do not suggest that the question of facility conditions is not a common one to the employees who worked there. The same is true of Comcast's contention that it repaired the facility some years after acquiring it. Whether Comcast repaired the facility after it gained control does not suggest the absence of a common question; this fact would, by definition, affect all claimants. Rather, it goes to the degree of success plaintiffs might have on their claims. Plaintiffs need not win their claim at this stage. Their allegations, widespread among named plaintiffs and putative class members, that the facility was infested and in poor repair amount to the "significant proof" of a common question that they must establish per *Wal-Mart*.

The complaints among the named plaintiffs and putative class members about the state of their equipment are equally widespread and likewise are part of the common question of whether the 112th Street facility constituted a hostile work environment. Each of the twelve named plaintiffs described problems with the equipment employees were issued, including vermin infestation and general defects. Comcast's response is that plaintiffs have not demonstrated that Comcast had a policy to "funnel[ ] roach-infested equipment to 112th Street in derogation of" central distribution policies. Def.'s Resp. at 10. To be sure, if there were a Comcast memo entitled "Policy to Funnel Roach-Infested Equipment to 112th Street," that would be helpful to plaintiffs. But given the unlikelihood that any company would ever expressly

propagate such a policy, the near-unanimity among the allegations of the named plaintiffs and the vast majority of putative class declarants is sufficient to show that the question of distribution of poor equipment is common among proposed class members.

Finally, Comcast contends plaintiffs have not shown a "systemic policy of disregarding discrimination complaints at 112th Street." Def.'s Resp. at 20. This is in part because "several Plaintiffs never raised any complaints." *Id.* at 21. Comcast, however, misconstrues this issue. The common question is not whether any one plaintiff complained to management, which after all is an action by plaintiffs, not Comcast. Rather, it is whether management "[f]ail[ed] to respond to and remedy complaints." Pls.' Class Cert. Mem. ¶ 3(d). Management's claimed failure to respond to complaints about conditions at the facility and racial hostility affects all employees at the facility in essentially the same way. Comcast contends that some of its managers did respond to complaints, but as with Comcast's argument that it fixed the facility, this argument goes to whether plaintiffs can win the merits of their claim, which they need not show at this stage.

In sum, the Court concludes that plaintiffs have shown significant proof of a common question among members of the class regarding whether there was a hostile work environment at the 112th Street facility.

### c. Typicality

Comcast next contends that plaintiffs cannot establish their claims meet the typicality requirement of Rule 23(a). Rule 23(a)(3) requires class plaintiffs to show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." This typicality requirement "directs the district court to focus on

whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009).

Plaintiffs contend that 112th Street employees "experienced the racial epithets that were common in the workplace" and did so "[a]s a class." Pls.' Mem. at 46. As discussed in the prior section, at least eleven of the twelve named plaintiffs described in their depositions hearing language that plaintiffs argue was racially hostile, and equal numbers discussed problems with the facility and equipment they used.

Comcast's single paragraph in its brief on this requirement of Rule 23(a) does not explain with any specificity why it is that the named representatives' claims supposedly do not share the same characteristics of the class at large. In fact, Comcast does not discuss the individual named plaintiffs at all, even though it is those plaintiffs whose claims must be typical of those of the class. Comcast does cite four district court cases which it contends stand for the proposition that "typicality [is] not met on hostile work environment claims." Def.'s Resp. at 47. But these cases do not describe a general rule in this regard; instead, they involve particular factual scenarios with particular evidence. *See Goodwin v. Conagra Poultry Co.*, No. 03-cv-1187, 2007 WL 1434905, at *14 (W.D. Ark. May 15, 2007) ("Plaintiffs work in different areas or departments throughout the Defendants' processing complex. They have different supervisors. Their claims arise out of differing events and conduct within the particular departments in which they work. As a result, their complaints are highly individualized."); *Elkins v. Am. Showa Inc.*, 219 F.R.D. 414, 425 (S.D. Ohio 2002) (rejecting typicality argument when "claims of many of the plaintiffs and putative class members do not involve similar

conduct" and "this is not a case where a named plaintiff who proved her own claim would prove anyone else's"); *Reid v. Lockheed Martin Aeronautics Co.*, 205 F.R.D. 655, 676 (N.D. Ga. 2001) (noting "Plaintiffs' failure to engage in any discussion that their harassment claims are susceptible to class-wide proof");.[2]  Contrary to Comcast's contention, courts in this district have certified hostile work environment classes in the past.  *See, e.g.*, *Smith v. Nike Retail Servs., Inc.*, 234 F.R.D. 648, 661 (N.D. Ill. 2006) ("Here the strength of the common injury and interest shared by the named plaintiffs and class members—the harm caused by an allegedly hostile work environment and the interest in eliminating that environment—plainly overrides any potential conflicts." (citation omitted)); *Adams v. R.R. Donnelley & Sons*, Nos. 98 C 4025, 96 C 7717, 2001 WL 336830, at *13 (N.D. Ill. Apr. 6, 2001) (Kennelly, J.) ("A claim of a racially hostile work environment is an appropriate subject of class certification, for by definition . . . it involves conduct targeted at a group.").

The Court has already concluded that plaintiffs have established commonality on their hostile work environment claim.  That discussion also explains why the named plaintiffs' claims are typical of those with the class:  not only did the vast majority of the named plaintiffs encounter racially offensive language and work with problematic equipment, but all of them worked in the same facility.  For all of these reasons, the Court also concludes that the claims of the named plaintiffs are typical of those of the class for purposes of Rule 23(a)(3).

---

[2] The first case Comcast cites for this proposition contains no reference at all to a hostile work environment claim.  *See Puffer v. Allstate Ins. Co.*, 255 F.R.D. 450, 457 (N.D. Ill. 2009) (claims of gender discrimination, unequal pay, and individual retaliation).

### d.    Adequacy

Rule 23(a)(4) requires that the named plaintiffs and class counsel "will fairly and adequately protect the interests of the class."  On this question, courts look to "the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests."  *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011).  Plaintiffs contend that there are no conflicts among class members, because they all worked in the same facility and they have "vigorously pursued the class claims."  Pls.' Mem. at 48.  They also contend proposed class counsel have sufficient experience in employment discrimination cases to serve as class counsel here.  As with the numerosity of the proposed hostile work environment class, Comcast does not challenge the adequacy of the proposed class representatives. The Court finds plaintiffs' adequacy arguments persuasive, and concludes that the proposed hostile work environment class satisfies Rule 23(a)(4).

### e.    Certification under Rule 23(b)(2)

Plaintiffs contend that their hostile work environment class satisfies Rule 23(b)(2) because they seek injunctive relief requiring Comcast to "prevent the hostile environment at 112th Street."  Pls.' Mem. at 49.  An injunction is appropriate, plaintiffs argue, because Comcast did not "remedy the situation" despite complaints from class members, and the "hazardous and stressful environment" at 112th Street caused many adverse consequences for black employees there.  *Id.*  That is the extent of plaintiffs' argument in their initial memorandum, although in their reply brief, they say that they wish to certify a liability and injunction class under Rule 23(b)(2) "separate from any issues of monetary damages."  Pls.' Repl. at 13.

The proposed hostile work environment class is inappropriate for certification under Rule 23(b)(2). That provision states that class certification is available if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The rule. however, "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Wal-Mart*, 131 S. Ct. at 2557. The Seventh Circuit has likewise held that "[t]he monetary relief sought in a case, whether denominated legal or equitable, may make the case unsuitable for Rule 23(b)(2) treatment." *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 825 (7th Cir. 2011). Furthermore, contradicting plaintiffs' contention in their reply that money damages can be determined later, an injunction must be "final" relief under Rule 23(b)(2), and "[a]n injunction is not a final remedy if it would merely lay an evidentiary foundation for subsequent determinations of liability"—such as monetary relief. *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 893 (7th Cir. 2011).

In this case, plaintiffs seek what eventually could prove to be substantial monetary damages in addition to their requested injunctive relief. Their amended complaint includes in its prayer for relief a request for compensatory and punitive damages in addition to "lost wages, including back pay, front pay and lost benefits." 1st Am. Compl. at 46. Although plaintiffs cite *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482 (7th Cir. 2012), for the proposition that class certification under Rule 23(b)(2) was "appropriate for liability and injunctive relief, separate from any issues of monetary damages," Pls.' Repl. at 13–14, plaintiffs in that case dropped their

request for certification under 23(b)(3). *See McReynolds*, 672 F.3d at 483. Here, by contrast, plaintiffs have not dropped their (b)(3) certification request. Instead, they maintain it along with their (b)(2) arguments. That is not the situation the Seventh Circuit addressed in *McReynolds*, and that case is thus unhelpful to plaintiffs in this regard.

The Court declines to certify plaintiffs' class under Rule 23(b)(2).

### f.     Certification under Rule 23(b)(3)

Plaintiffs next argue that the Court should certify their class under Rule 23(b)(3) because they seek money damages and because "each class member has the same discrimination claims." Pls.' Mem. at 50. A class is certifiable under Rule 23(b)(3) if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Comcast contends that plaintiffs cannot show their class satisfies either the predominance or superiority requirements of this rule.

Comcast first contends that predominance is lacking because the Court will have to examine each class member's individual circumstances in order to find that each member experienced a hostile work environment. That is essentially the extent of Comcast's argument, which it makes largely by block quoting a   district court case from outside this district. *See* Def.'s Resp. at 49–50 (quoting *Goodwin*, 2007 WL 1434905, at *16). Comcast makes no real effort to explain its contention. It does not, for example, discuss how plaintiffs might have experienced the hostile work environment differently. Plaintiffs respond that they need not show "perfect uniformity" to show that common

issues predominate with regard to their proposed hostile work environment class. Pls.' Repl. at 14.

"Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). In evaluating this requirement of Rule 23(b)(3), courts are to keep in mind that "[p]redominance is a qualitative rather than a quantitative concept," which "is not determined simply by counting noses." *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014). Further, Rule 23(b)(3) "does not require a plaintiff seeking class certification to prove that *each element* of her claim is susceptible to classwide proof." *Amgen v. Conn. Ret. Plans & Trust*, 133 S. Ct. 1184, 1196 (2013) (emphasis added). In addition, it is "not required" for named plaintiffs to show "common results for members of the class"; the predominance requirement "does not impose such a heavy burden." *Messner*, 669 F.3d at 819. In other words, to demonstrate predominance of common questions, plaintiffs need not also show "common answers" for each plaintiff. *Id.*

The Court has concluded that plaintiffs have established a significant common question among class members, namely whether they were subject to conditions constituting a hostile work environment at the 112th Street facility based on abusive language, a dilapidated, infested facility, and problematic equipment. Put simply, this common question is whether conditions at 112th Street presented a hostile work environment for the African-American employees there. Comcast may be correct that damages may differ among plaintiffs—perhaps given the length of time that they worked at the facility, how often they were on site as opposed to in the field, and so on—but this do not undermine the fact that the fundamental question that predominates is a

40

common question, namely whether there was a hostile work environment in plaintiffs'

workplace.  The Seventh Circuit has consistently held that "common proof of damages

for class members . . . is not required."  *Id.*; *see also Butler v. Sears, Roebuck & Co.*,

727 F.3d 796, 801 (7th Cir. 2013) ("If the issues of liability are genuinely common

issues . . . the fact that damages are not identical across all class members should not

preclude class certification. Otherwise defendants would be able to escape liability for

tortious harms of enormous aggregate magnitude but so widely distributed as not to be

remediable in individual suits.").  In this case, given the number of plaintiffs and putative

class members who heard language that may have been racially abusive and say that

they worked with shoddy equipment in shoddy conditions, Comcast has not

persuasively argued that "[q]uestions of individual damage calculations will inevitably

overwhelm questions common to the class."  *Comcast*, 133 S. Ct. at 1433.  The Court

therefore concludes plaintiffs' proposed hostile work environment class satisfies the

predominance requirement of Rule 23(b)(3).

Plaintiffs also argue that the Court should certify plaintiffs' proposed classes

under Rule 23(c)(4) "for liability only" if the Court decides "that the issue of determining

each class members' [sic] damages predominates over the common issues of law and

fact in this case."  Pls.' Mem. at 53.  Because the Court has concluded that plaintiffs'

hostile work environment allegations satisfy the predominance requirement of Rule

23(b)(3), the Court need not address plaintiffs' Rule 23(c)(4) argument at this time.  If,

however, damages questions ultimately prove to present significant manageability or

similar problems, the Court could modify the certification to limit its scope to liability

only, which would appropriately be an issues class under Rule 23(c)(4).  *See*

*McReynolds*, 672 F.3d at 491 (permitting issues-only class concerning "a pair of issues that can most efficiently be determined on a class-wide basis"); Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues."). The Court is also permitted to hold separate hearings or trials for damages. *See Butler*, 727 F.3d at 800 ("[A] class action limited to determining liability on a class-wide basis, with separate hearings to determine—if liability is established—the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4)").

Comcast also argues that plaintiffs' proposed hostile work environment class "would not be the superior method of adjudicating these claims," because there is no "unifying thread among Plaintiffs and the putative class members on these issues." Def.'s Resp. at 50. Comcast contends the case would "devolve into a series of mini-trials based on each individual's unique experiences." *Id.* at 50–51. Lacking from this argument is anything specific to this case whatsoever. It appears instead to be a retread of Comcast's predominance argument, which the Court has already discussed.

Plaintiffs contend that classwide treatment is the superior method of adjudicating this case because there are at least 350 potential class members, and aggregation would enable greater efficiency. They maintain that "it is very unlikely that any of the putative class members would be awarded relief without class certification given their numerosity and in some cases their individual small damage claims." Pls.' Mem. at 52. Comcast does not answer this argument, and it is more persuasive than Comcast's generic statements to the contrary. The Court concludes that plaintiffs' hostile work environment class has satisfied the predominance requirement of Rule 23(b)(3) and that

certification of the class is proper under Rule 23(b)(3).

### g.    Scope of the class

At the end of its response to plaintiffs' motion for class certification, Comcast briefly argues that even if the Court grants plaintiffs' motion, the class should be limited in size in three ways.  First, Comcast says the class "should be limited temporally to no more than four years from Plaintiffs' original complaint on their Section 1981 claims (to November 28, 2007), and no more than 300 days before the first of their EEOC charges on their Title VII claims (to November 28, 2007)."  Def.'s Resp. at 52.  Second, Comcast contends the class should exclude any 112th Street African-American employee who is not or was not a service or line technician, because the named plaintiffs all serve or served in those two positions only.  Finally, Comcast argues the class "should exclude any supervisors, to avoid a conflict between class members and the alleged wrongdoers."  *Id.* at 53.

Comcast's argument that the class should be "temporally" constricted arises from plaintiffs' contention in their motion that the Supreme Court's decision in *Morgan* permits them to "seek to expand the limitations period of the hostile work environment class." Pls.' Mot. to Certify Class at 4 n.1 (citing *Morgan*, 536 U.S. at 117).  That case stands for the proposition "that in a hostile-workplace claim, acts of harassment falling outside Title VII's statute of limitations may be considered as long as some act of harassment occurred within the limitations period."  *Turner v. The Saloon, Ltd.*, 595 F3d 679, 681 (7th Cir. 2010.  The Court based this conclusion in part on the unique nature of hostile work environment claims, which "are different in kind from discrete acts" because "[t]heir very nature involves repeated conduct" and "are based on the cumulative effect of

individual acts." *Morgan*, 536 U.S. at 115. The Supreme Court went on:

> It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

*Id.* at 117. This is true, the Court said, even if the unlawful employment practice "is still occurring." *Id.*

Comcast contends that *Morgan* was limited to individual hostile work environment claims, citing a district court case opining that "*Morgan* is silent on whether a class can include class members who did not experience any acts of harassment during the filing period." Def.'s Resp. at 52 n.32 (quoting *EEOC v. Custom Cos., Inc.*, Nos. 02 C 3768 & 03 C 2293, 2004 WL 765891, at *4 (N.D. Ill. Apr. 7, 2004)). Yet that case dealt with a proposed class including employees who did not work at the defendant company during the EEOC filing period. Comcast makes no argument that plaintiffs' proposed class contains employees who similarly did not work at 112th Street during the filing period or "did not experience any acts of harassment during the filing period." *Custom Cos.*, 2004 WL 765891, at *4. Considering this fact, there is no good reason why *Morgan* would not apply and permit the class to focus on activity that occurred beyond the statutes of limitations on plaintiffs' claims. The Court thus declines to limit the temporal window of the class.

Comcast also argues the number of people in the class should be decreased. It contends that the class "should exclude African-Americans who have not worked as Service or Line Technicians, such as warehouse, customer service, and other non-technician employees." Def.'s Resp. at 52. This is because, Comcast says, plaintiffs

did not present evidence about discrimination in those departments. Yet plaintiffs' evidence by its nature concerns the entirety of the facility at 112th Street. Their evidence of the working conditions, equipment problems, and racially derogatory language in use at 112th Street logically would affect all African-American employees there, not just those in particular positions.

Finally, Comcast contends that the class "should exclude any supervisors, to avoid a conflict between class members and the alleged wrongdoers." *Id.* at 53. Though neither side has fleshed out this issue adequately, the Court agrees that including as class members managers and supervisors who are claimed to have contributed to causing the hostile work environment or who are accused of ignoring complaints about it likely would create significant conflicts among the class. The problem is that the Court is not in a particularly good position to ascertain which particular supervisors and managers might fall into these categories. The only point the parties make that addresses the particulars of this issue is Comcast's statement, in an earlier section of brief, that only "a small percentage of the predominately African-American supervisors and managers" at 112th Street were responsible for alleged discriminatory conduct. Def.'s Resp. at 2. The onus of identifying which African-American supervisors and managers have been accused of hostile work environment-related wrongdoing or are claimed to have ignored complaints appropriately should be placed on the parties in the first instance. Each side is directed to submit a position paper identifying those persons within seven days after entry of this order, and the Court will address the matter further at the status hearing to be held thereafter.

## 2. Overall terms and conditions class

Plaintiffs say that they their proposed overall terms and conditions class is "based on the same evidence" as the hostile work environment class, "irrespective of the hostile work environment theory." Pls.' Mem. at 37, 43. The events giving rise to liability for this class, however, date back to November 2007, as opposed to January 1, 2005 with the hostile work environment class.[3] In general, plaintiffs contend that "the condition of the facility and Comcast's policy of providing inferior tools and equipment" are the activities that form the basis for classwide liability with respect to the terms and conditions class. *Id.* at 38. Also, plaintiffs say that "[t]he racially hostile language and treatment is additional evidence of Comcast's discriminatory intent." *Id.*

At another point in their main brief, however, plaintiffs also state that the proposed terms and conditions class presents the "common issue[ ]" of "whether African Americans at 112th Street suffered adverse employment consequences as a result of the alleged discrimination." *Id.* at 43. Although plaintiffs do not say so at this point in their brief, this appears to be a reference to the inequitable pay, promotions, and discipline plaintiffs argue resulted from the conditions and equipment at 112th Street that are also the subject of plaintiffs' three other proposed classes. If there are any differences between the events giving rise to plaintiffs' proposed hostile work environment and their terms and conditions classes, they appear to be (1) the date on which plaintiffs argue liability began and (2) the question of whether the terms and conditions of plaintiffs' employment exposed them to adverse employment

---

[3] At the Court's hearing to clarify plaintiffs' class certification motion, plaintiffs stated that the difference in dates between the two classes derives from the way in which the statute of limitations applies to each type of claim.

consequences.

If the terms and conditions class relied solely on the same events as the hostile work environment class, only with a different starting date and different legal theory, the Court likely would not need to go much further. As described above, the Court has determined to certify the hostile work environment class, which has an earlier starting date and would encompass the population of the terms and conditions class if the claims underlying each had the same scope. However, plaintiffs' contention that the terms and conditions class encompasses the "common issue[ ]" of "whether African Americans at 112th Street suffered adverse employment consequences" creates a different inquiry, involving plaintiffs' contention that they suffered disparities in pay, promotions, and discipline. The Court must therefore address whether this proposed class, whose definition is broader though its numbers are smaller, presents a common question sufficient to satisfy Rule 23(a).

Comcast contends that it does not. It argues that, as in *Wal-Mart*, the adverse employment consequences that underlie the claims of this class cannot provide a path to commonality among plaintiffs, because there is wide variation among individuals regarding the adverse employment consequences involved. Comcast says that "there is no common source explaining pay discrepancies, foregone promotions, or discipline—but rather individualized and decentralized decision-making." Def.'s Resp. at 44. Comcast contends further that plaintiffs' statistical evidence on disparities between the employment characteristics of African-Americans at 112th Street and other Comcast employees do not support a finding of commonality for the terms and conditions class. It argues that its own expert's analysis shows no disparity in pay or

promotions between 112th Street workers and their peers, and also that working with used equipment does not lower employee performance.

Plaintiffs respond by criticizing Comcast's calculations and reiterating their own expert's statistical findings. They also contend that even if discrimination at 112th Street were "the result of individualized and decentralized decision-making," the Court should still certify the class. Pls.' Repl. at 13. This is because, plaintiffs argue, "Comcast did not exercise sufficient oversight to ensure that policies were being enforced in a non-discriminatory manner." *Id.* (citing *Brown v. Yellow Transp., Inc.*, No. 08 C 5908, 2011 WL 1838741, at *5 (N.D. Ill. May 11, 2011)).

As plaintiffs themselves state in their reply, they "do not know at this stage precisely *why* each individual was terminated." Pls.' Reply at 12. They contend, however, that they "can nonetheless establish a pattern of higher termination rates for African Americans." *Id.* Yet plaintiffs do not explain why this pattern is sufficient to satisfy the requirements in *Falcon* and *Wal-Mart* for meeting the commonality requirement. *See Falcon*, 457 U.S. at 159 n.15 (calling for "[s]ignificant proof that an employer operated under a general policy of discrimination"). In *Wal-Mart*, plaintiffs also presented "statistical evidence about pay and promotion disparities" as well as "anecdotal reports of discrimination." *Wal-Mart*, 131 S. Ct. at 2549. The Court concluded this evidence fell "well short," in part because the statistics did not help plaintiffs identify a "specific employment practice" leading to the pay and promotion discrepancies. *Id.* at 2555–56. "Merely showing that Wal-Mart's policy of discretion has produced an overall sex-based disparity," the Supreme Court said, "does not suffice" to show commonality. *Id.* at 2556.

48

The Seventh Circuit has decided against a finding of commonality on similar grounds. After *Wal-Mart* was decided, the Seventh Circuit said that statistical evidence of discrimination as proof of commonality is problematic because it "begs the question." *Bolden*, 688 F.3d at 896. In *Bolden*, plaintiffs used statistics to argue white and Hispanic workers worked more overtime than African-American workers, but this evidence did not demonstrate the common question of whether all supervisors discriminated in distributing overtime. "If Walsh had 25 superintendents, 5 of whom discriminated in awarding overtime," the court said, "aggregate data would show that black workers did worse than white workers—but that result would not imply that all 25 superintendents behaved similarly, so it would not demonstrate commonality." *Id.* at 897.

So too is the case here. Statistical data indicating adverse outcomes for 112th Street employees' pay, promotion, and discipline overall does not answer the commonality question for purposes of Rule 23. An average salary for a group of employees within that workplace shows just that, an average. The commonality inquiry concerns whether the individual experiences of those whose salaries make up the average share enough common ground. A statistical average might mean that all African-American workers at 112th street have salaries at or near the same amount, or it could mean subgroups have salaries at the extremes and that the average represents the mean of those extremes. Plaintiffs' contention that there is a common question of "whether African Americans at 112th Street suffered adverse employment consequences as a result of the alleged discrimination" actually references a host of decisions, any two of which could have been made for different reasons. Plaintiffs'

statistical analyses do little to change this and for that reason go no further toward establishing commonality on behalf of plaintiffs' proposed terms and conditions class.

Plaintiffs' fallback position, that commonality can be shown even if "discrimination is the result of individualized and decentralized decision-making," because Comcast did not sufficiently prevent the discrimination, Pls.' Repl. at 13, is similarly lacking. The sole case it cites for this proposition is a district court case that predates *Wal-Mart*[4] and relies only on other district court cases for the proposition that "subjectivity in decisionmaking does not preclude a finding of commonality." *Brown*, 2011 WL 1838741, at *5. That is essentially the opposite of *Wal-Mart*'s holding; the plaintiffs in that case could not establish commonality in part because they "ha[d] not identified a common mode of exercising discretion that pervades the entire company." *Wal-Mart*, 131 S. Ct. at 2554–55. In other words, plaintiffs could "identif[y] no 'specific employment practice'" or "companywide discriminatory pay and promotion policy." *Id.* at 2555, 2556. Considering *Wal-Mart*'s emphasis on "significant proof" of a "general policy of discrimination" to show commonality, *id.* at 2554, *Brown* is no longer persuasive on this point.

Given the analysis above, the Court declines to certify plaintiffs' proposed terms and conditions class. It fails to satisfy the commonality requirement of Rule 23(a).

### 3. Pay, promotions, and discipline / termination classes

The conclusions the Court has reached regarding plaintiffs' proposed terms and conditions class apply equally to their remaining three proposed classes. Each relies on statistics and anecdotal evidence to allege a general policy of discrimination. Many of

---

[4] *Brown* was decided on May 11, 2011; *Wal-Mart* was decided on June 20, 2011.

the injuries within each of these classes appear, however, to have been the product of individual circumstances and decision making rather than a common policy or decision. These individual differences preclude certification of these classes.

### a.    Promotions class

Plaintiffs argue that the common question among members of the proposed promotions class "is whether Comcast discriminated against African Americans at 112th Street by failing to promote them at the same rate as similarly situated white employees."  Pls.' Mem. at 44.  They contend that Comcast maintained "promotion policies" that "resulted in discrimination against" plaintiffs, *id.* at 20, a statement followed by a description of the various technician ranks at Comcast and how employees can attain them.  As plaintiffs describe it, each move upward requires a training course, examinations, performance goals, lack of disciplinary infractions, an interview, or some combination of these elements.  Plaintiffs contend that they were denied the means to move up within Comcast's system.  They argue that they did not receive the training necessary to attain promotions at Comcast and discuss their expert's statistical findings, which include varying pass rates between African-Americans working at 112th Street as compared with white Comcast employees at suburban locations.[5]

To begin with, the "promotions policy" as plaintiffs describe it does not in itself contain any discriminatory elements.  It simply establishes a progression for employees to accede to higher-ranked positions within Comcast, setting up various requirements along the way.  Plaintiffs appear instead to be arguing that the way the policy was

---

[5] Plaintiffs also point to their expert's analysis of pass rates for all African-American Comcast employees as compared with those of all white Comcast employees in the Chicago area.  As noted above in discussing Comcast's motions to strike, the Court declines to consider this evidence for purposes of plaintiffs' motion for class certification.

implemented was discriminatory—not that the policy itself was discriminatory. That does not help them in their task to demonstrate commonality, a problem borne out by plaintiffs' own descriptions of differences in various plaintiffs' experiences. For example, plaintiffs state that seven of the twelve named plaintiffs were denied Comcast Digital Voice training—meaning that five of them did receive this training, differentiating nearly half the named plaintiffs from the other half. Plaintiffs also say that certain employees did in fact receive training and subsequent promotions and raises, just on a delayed basis, citing different waiting times for each employee they mention. These differences add to the impression that plaintiffs' promotions allegations do not derive from "a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor," as they must in order to satisfy Rule 23(a)'s commonality requirement. *Wal-Mart*, 131 S. Ct. at 2551.

Compounding this issue is the fact that plaintiffs themselves provide evidence that supervisors and managers had control over or at least input into which employees received training, and over performance evaluations. This contributes to the conclusion that each employee's experience with promotions or lack thereof could have varied from manager to manager. Plaintiffs place significant emphasis on their differential treatment in terms of access to training, but they also state that "[s]upervisors are responsible for enrolling employees in the required training course(s) and providing the exams." Pls.' Mem. at 21. Plaintiffs also say that employees at 112th Street are now able to sign up for training themselves—which requires supervisor approval. *See id.* at 22 n.13. Similarly, if a plaintiff wishes to progress from the NCT4 to NCT5 level, he must "complete NCT5 training"—which requires supervisor permission—and separately

"attain supervisor approval" to rise to the position. *Id.* at 21.

The individual experiences of the six named plaintiff members of the subclass help illustrate the problem. Plaintiff Peterson complained in the excerpt of his deposition provided to the Court that he had not received caller ID training, but he stated that he called his supervisor to ask for the training and does not say whether he received it as a result. Plaintiff Elder testified in his deposition that he had received training at Comcast's Hickory Hills and North Chicago facilities, five times at the latter. He also said he received training to move between CommTech levels 3 and 4, which was delayed because of his supervisor, a decision he did not attribute to his race. Plaintiff Hart indicated that he personally had trained between seventy-five and 100 technicians at the request of Comcast management. Plaintiff Brand mentioned that he never had a supervisor fail to provide him with approval to attend classroom training, and he stated that he recalled taking web-based training on harassment. As these anecdotes indicate, even a cursory survey of plaintiffs' allegations on training reveals many differences among them—and this accounts only for the named plaintiffs, not the rest of the 200 class members plaintiffs estimate. *See* Pls.' Mem. at 40.

As for plaintiffs' statistical evidence of pass rate disparities between 112th Street black employees and white employees in the suburbs, the Court has already discussed above how such statistical analyses do not go further in establishing commonality. The statistics do not provide any insight about the "glue holding the alleged *reasons* for all those decisions together," *Wal-Mart*, 131 S. Ct. at 2552; they constitute a reporting of results, not any common reasons for those results.

The Court declines to certify plaintiffs' proposed promotions subclass for failure to

meet the commonality requirement of Rule 23(a)(2).

### b. Pay class

Plaintiffs' proposed pay class includes "[a]ll current and former technicians at the CT 2 or higher level who were denied equal and appropriate pay rates." Pls.' Mem. at 38. As with the promotions class, plaintiffs contend that statistical and anecdotal evidence supports a finding of commonality here, because class members were not paid "at the same rate as similarly situated white employees." *Id.* at 44. This class is arguably an extension of the promotions class, because plaintiffs allege that a failure to receive promotions resulted in a failure to achieve a higher pay level. Here, plaintiffs present additional statistical evidence, including plaintiffs' expert's conclusion that "African Americans at 112th Street were paid $.40 per hour less than white employees in the suburbs." *Id.* at 27. As for anecdotal evidence, plaintiffs argue that "seven of the twelve named plaintiffs were paid significantly less when compared to all other employees" at Comcast's Chicago sites. *Id.* at 30.

Much of the above analysis with regard to plaintiffs' proposed promotions class also applies here. Indeed, the facts relevant to the two classes appear to merge. Plaintiffs allege that training, among other factors, is necessary to move up each level within Comcast's technician hierarchy, and attaining new levels of rank within Comcast is necessary to acquire higher pay. *See* Pls.' Mem. at 23 ("Without the necessary training, 112th Street technicians were unable to receive promotions to higher titles and were denied higher pay."). Therefore, the differences among individual plaintiffs with regard to training enrollment and other factors dictated partially or in full by individual managers also apply to the pay class. The addition of statistical evidence of pay rates

does not add significant proof of commonality among class members where it was lacking with the promotions class. The problems of individual manager discretion in training decisions and individual plaintiffs' different experiences receiving training, among other things, apply equally here. The Court has already discussed why *Wal-Mart* and *Bolden* counsel against allowing statistics to substitute for actual evidence of a common contention of discrimination among plaintiffs. As with the promotions class, the Court declines to certify plaintiffs' proposed pay class because it does not comply with the commonality requirement of Rule 23(a).

### c. Discipline / termination class

Finally, plaintiffs have moved for certification of a class of technicians at the 112th Street facility "who were subjected to discriminatory discipline or terminations." Pls.' Mot. at 6. Plaintiffs base this proposed class on the issuance of performance improvement plans (PIPs) to technicians who had to make repeat calls to specific customers. Plaintiffs attribute the necessity of these repeat calls to poor equipment they had to work with, and they contend that African-American employees at 112th Street "had the overall highest 'rework' or 'repeat' numbers for 2008, 2009, 2010 (except Cortland), 2011, and 2012." Pls.' Mem. at 32. They also contrast the likelihood of a 112th Street employee to receive a PIP with the lower chance of receiving one at Comcast's other two facilities within Chicago's city limits. In addition, they describe the experiences of two of the four named plaintiffs of the class, who received PIPs, were terminated, and were then reinstated. Finally, plaintiffs provide statistics indicating that more African-American employees were terminated proportionately than white employees at 112th Street.

At the outset, the inclusion of the word "discriminatory" in the class definition presents a commonality problem. The question of whether the decision to subject any individual employee to discipline or termination was discriminatory necessarily involves exploration into the facts of that individual's circumstances.

In their class certification memorandum, plaintiffs contend that this class presents the common question of "whether Comcast discriminated against African American technicians at 112th Street by adhering to a Performance Improvement Plan program which knowingly caused disproportionate discipline and/or terminations of African American technicians at 112th Street." *Id.* at 45. The Seventh Circuit in *Jamie S.* specifically warned against allowing purported common questions such as this one to establish Rule 23(a) commonality. "[S]uperficial common questions—like whether each class member . . . 'suffered a violation of the same provision of law'—are not enough." *Jamie S.*, 668 F.3d at 497. In that case, the plaintiffs presented the common issue that all "class members have suffered as a result of MPS' failure to ensure their Child Find rights under IDEA and Wisconsin law." *Id.* at 497. This formulation "completely misunderstands Rule 23(a)(2)," the court said, because it referred to "the bottom-line liability question in any individual plaintiff's IDEA claim." *Id.* To claim that all class members "have 'suffered'" as a result of disparate treatment "is not enough; it does not establish that the individual claims have any question of law or fact in common." *Id.* The same is true here.

As with their proposed pay and promotions classes, plaintiffs also marshal statistics in response to Comcast's contention that the class lacks commonality. They point to higher rework rates for 112th Street technicians, and argue "that 112th Street

employees were more than twice as likely to be subject to a PIP than employees at the other two city facilities" as well as termination rates. Pls.' Repl. at 12. Yet as plaintiffs concede in their reply memorandum, they "do not know at this stage precisely *why* each individual was terminated" (though they contend they "can nonetheless establish a pattern of higher termination rates for African Americans"). *Id.* This statement reflects that plaintiffs' discipline and termination claims as set forth here do not possess "a common contention" wherein "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 131 S. Ct. at 2551. Plaintiffs do not, for example, point to a single entity intervening in the disciplinary decisions of individual managers or an overall policy pursuant to which 112th Street managers tended to discipline or terminate their employees more than those at other facilities. As Comcast observes, the PIP program was in place for all of Comcast's Chicago-area facilities, not just 112th Street. If individual managers at 112th Street applied that policy disproportionately toward individual technicians at that facility, it gets plaintiffs no closer to showing the requisite commonality, absent significant proof of a common contention among those technicians—"the crucial question *why was I disfavored.*" *Wal-Mart*, 131 S. Ct. at 2552.

The Court determines that plaintiffs' proposed discipline and terminations class does not meet the commonality requirement of Rule 23(a)(2) and thus declines to certify the class.

## Conclusion

For the reasons stated above, the Court grants plaintiffs' motion for class certification in part [docket no. 49]. The Court certifies plaintiffs' proposed hostile work

environment class, currently defined as including all current and former African American employees at the 112th Street facility during the period January 1, 2005 and the present, subject only to the issue of which supervisors or managers should be excluded, a matter the Court will determine promptly. Each side's position paper on that point is to be filed by July 14, 2014. The Court otherwise denies plaintiffs' motion.

The Court also denies the parties' motions to strike or bar the reports, declarations, and testimony of witnesses Campion [docket no. 61], Siskin [docket no. 92], Kelly [docket no. 78], and Blank [docket no. 63].

Finally, the case is set for a status hearing on July 17, 2014 at 9:30 a.m.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: July 5, 2014